Monique Olivier, State Bar No. 190385
OLIVIER SCHREIBER & CHAO LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: 415. 484.0980
Email: monique@osclegal.com

Mana Barari, State Bar No. 275328
Carole Vigne, State Bar No. 251829
Henry Hewitt, State Bar No. 40851
LEGAL AID AT WORK
180 Montgomery Street, Suite 600
San Francisco, CA  94104
Telephone:  (415) 864-8848
Facsimile:  (415) 593-0096
Emails:  mbarari@legalaidatwork.org,  cvigne@legalaidatwork.org,  hhewitt@legalaidatwork.org

*Attorneys for Plaintiff and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS CASTILLO, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CLEANNET USA, INC., a Virginia corporation; D&G ENTERPRISES, INC., a California corporation, dba CLEANNET OF THE BAY AREA and CLEANNET OF SAN JOSE, <br><br> Defendants. | Case No.: 3:17-cv-07277-JCS <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> 1.  VIOLATION OF THE FEDERAL TRAFFICKING VICTIMS PROTECTION ACT <br> 2.  VIOLATION OF THE CALIFORNIA TRAFFICKING VICTIMS PROTECTION ACT <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff LUIS CASTILLO ("Plaintiff"), on behalf of himself and all others similarly situated, complains and alleges as follows:

## INTRODUCTION

1.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this class action alleging labor trafficking claims on behalf of himself and a proposed class of similarly situated individuals against Defendants CleanNet USA, Inc. ("CleanNet USA"), D&G Enterprises, Inc. ("D&G"), dba CleanNet of the Bay Area and CleanNet of San Jose. (CleanNet USA and the D&G are collectively referred to as "CleanNet" or "Defendants.")

2.    CleanNet USA is a nationwide company which provides janitorial services to businesses and other facilities. Under its business model, CleanNet USA enters into franchise agreements with local area operators, including D&G, which operates primarily in the San Francisco Bay Area.  Pursuant to its franchise agreement with CleanNet USA, D&G sells purported local franchises to individuals such as Plaintiff, who perform the janitorial services.

3.    Plaintiff and putative class members ("Class Members") are individuals who, in addition to the investment of significant sums of personal savings, financed the purchase of a purported franchise from D&G through a loan from D&G, and performed janitorial services on behalf of Defendants in California during the relevant time period.

4.    The class claims center on the fact that CleanNet engages in a scheme of selling franchises through burdensome long-term financing in order to trap Plaintiff and Class Members into janitorial jobs that they cannot leave.  As part of its scheme, CleanNet preys on individuals seeking good work opportunities by using high pressure sales tactics, failing to disclose material information and documents, making misrepresentations about critical terms, promising guaranteed accounts that it does not actually provide, and guaranteeing income that unwitting franchise "purchasers" do not actually receive.  Based on misrepresentations and false promises, CleanNet sells "franchises" at an enormous expense to Plaintiff and Class Members, causing Plaintiff and Class Members to enter into long-term debt arrangements with CleanNet in order to afford such purchase. After charging large sums of money in up-front payments and lending additional monies in this bait-and-switch scheme, CleanNet threatens Plaintiff and putative class

SECOND AMENDED CLASS ACTION COMPLAINT

1    members with huge financial penalties—including the complete loss of the franchise and their

2    initial investment—if they were to withdraw from the agreement or turn down work assignments.

3        5.      As set forth below, Defendants have violated the federal Trafficking Victims

4    Protection Act ("TVPA") and the California Trafficking Victims Protection Act ("CTVPA") by

5    securing the labor and services of Plaintiff and Class Members through the imposition of long-

6    term and ruinous loans taken out to purchase franchises, sold pursuant to deceptive

7    misrepresentations regarding income and job opportunities.  Plaintiff and Class Members were

8    thus compelled to provide janitorial services on behalf of Defendants under threats of serious

9    financial harm and due to fear of financial repercussions of defaulting on their loans if they

10   stopped working.

11       6.      This scheme led Plaintiff and Class Members to reasonably believe that in order

12   to avoid serious harm, they had no option but to provide services and labor to Defendants.

13       7.      This action seeks damages on behalf of Plaintiff and Class Members, declaratory

14   relief, restitution, and attorneys' fees and costs.

15                         **JURISDICTION AND VENUE**

16       8.      This Court has jurisdiction over the federal trafficking claim alleged herein

17   pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1595(a) (civil

18   trafficking).

19       9.      This Court has supplemental jurisdiction over the state law trafficking claim

20   pursuant to 28 U.S.C. § 1367(a), as the state law claim arises out of the same nucleus of facts

21   which support the federal claim.

22       10.     Venue is proper in this Court under 28 U.S.C. §1391 because Plaintiff resides and

23   worked in this District, Defendants and/or agents of Defendants reside and/or may be found in

24   this District, and a substantial portion of the communications, transactions, events or omissions

25   underlying Plaintiff's claims occurred in this District.

26                              **PARTIES**

27       11.     Plaintiff is a resident of San Francisco, California.  Plaintiff performed janitorial

28   services for CleanNet in the San Francisco Bay Area between approximately August 2011, when

1    he purchased his "franchise" through financing directly from D&G, and approximately 2015.

2    Plaintiff seeks to represent a class of similarly situated individuals who purchased a franchise

3    from D&G through a loan from D&G, and who performed, or are performing, janitorial services

4    on behalf Defendants in California at any time during the period from at least ten years prior to

5    the filing of the original complaint in this action through the present (the "Class Period"). [1]

6           12.    Defendant CleanNet USA, Inc. ("CleanNet USA") is a Virginia corporation with

7    its principal place of business in Columbia, Maryland. On information and belief, CleanNet USA

8    is a suspended corporation in California. At all relevant times, CleanNet USA has been doing

9    business in California.

10          13.    Defendant D&G Enterprises, Inc. ("D&G") is a California corporation and an

11   Area Operator for CleanNet USA.  D&G's principal place of business is in Oakland, California.

12   On information and belief, D&G is doing business under the fictitious business names of

13   CleanNet of the Bay Area and CleanNet of San Jose.

14          14.     Defendants are operating a single, integrated business of providing janitorial

15   services to commercial clients in D&G's franchise territory. In the alternative, D&G is ostensibly

16   the agent of CleanNet USA.

17          15.    At all relevant times, each Defendant was the agent or employee of each of the

18   other Defendants and was acting within the course and scope of such agency or employment

19   and/or with the knowledge, authority, ratification and consent of the other Defendants.

20                              **FACTUAL BACKGROUND**

21   **A.    The Global Human Trafficking Epidemic.**

22          16.    Trafficking in human persons is a growing scourge around the world.  The United

23   States government estimates that there are currently more than 20 million victims of human

24   trafficking.[2]

---

25   [1] Plaintiff's and Class Members' claims may cover a period longer than ten years due to equitable

26   tolling.

     [2] U.S. Dep't of State, Trafficking in Persons Report 7 (2013) (reporting that social scientists

27   estimate that as many as 27 million persons are trafficking victims at any given time); U.S. Dep't
     of State, Trafficking in Persons Report 45 (2012) (hereinafter "TIP 2012") (estimate of modern

28   slavery worldwide increased from 12.3 million victims in 2005 to 20.9 million victims in 2012).

17.     Human traffickers prey on the most vulnerable members of society.  Traffickers often trick, coerce, or win the confidence of their victims through promises of a better life,[3] frequently using "bait-and-switch scenarios."[4]

18.     In an early effort to combat human trafficking domestically and abroad, Congress passed and repeatedly reauthorized the Trafficking Victims Protection Act of 2003 ("TVPRA").

19.     The TVPRA authorizes victims of human trafficking to file a civil action against any perpetrator or whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known was engaged in slavery, peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.  The United States' commitment to prioritize anti-trafficking efforts is also manifest in its decision to become party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with 163 other nations.

**B.     The Prevalence of Human Trafficking in the U.S. Janitorial Industry.**

20.     The janitorial industry in the U.S. is repeatedly recognized as one of the common industries vulnerable to trafficking.[5]

21.     Labor trafficking occurs when an employer compels or tricks a worker into providing involuntary labor. [6]  The employer "often uses violence, threats, manipulation of debt, blackmail, or fraud to compel victims to work." [7]  "Typically, such work takes place in abusive

---

[3] U.S. Dep't of State, Trafficking in Persons Report 8 (2009).

[4] U.S. Dep't of State, Trafficking in Persons Report 27 (2011).

[5] *The Typology of Modern Slavery: Defining Sex and Labor Trafficking in the United States*, POLARIS, (Mar. 2017) (https://polarisproject.org/sites/default/files/Polaris-Typology-of-Modern-Slavery.pdf) (Recognizing cleaning services as one type of industry susceptible to human trafficking); See What is Human Trafficking (https://oag.ca.gov/human-trafficking/what-is) ("Labor trafficking arises in many situations, including…janitorial work.:); See Bright, Emily K. "Shunu Shrestha: Working to prevent human trafficking in Minneapolis" Minn Post. (September 5, 2018) (https://www.minnpost.com/community-sketchbook/2018/09/shunu-shrestha-working-to-prevent-human-trafficking-in-minneapolis/) (Listing janitorial services as a field where labor trafficking occurs.)

[6] *A Human Rights Approach to Ending Trafficking and Exploitation in the Workplace,* The Advocates for Human Rights, 3 (2016).

[7] *Id.*

conditions, such as an unsafe work environment, long hours without breaks, or without pay."[8] These forms of recruitment and control manifests in the janitorial industry.[9]

22.     An analysis by Polaris reported that victims of labor trafficking have been found in commercial cleaning businesses that provide janitorial services to multiple private households, office buildings, and other commercial businesses.  The recruitment occurs through "[f]raudulent job offers or other false promises."[10]

23.     The methods of control used by the traffickers, which may include business owners or family members, include being told they must work off a debt, having their passports withheld, or being coerced with "threats of homelessness or deportation if they refuse to continue working."[11]

24.     A study examining the labor trafficking experiences of Spanish-speaking workers in San Diego County, California found that janitorial/cleaning was one of the top "business sectors rife with trafficking violations and abusive labor practices."[12] Threats to physical integrity, restriction and deprivation, and deception and lies, were particularly high in janitorial services.[13]

**C.     CleanNet's Corporate Structure and Business Model.**

25.     CleanNet provides commercial cleaning and janitorial services to businesses throughout the United States. As described herein, CleanNet purports to operate pursuant to a multi-tier franchise model. CleanNet USA sells local franchises through a network of corporate entities and fictitious business entities, which are referred to "Area Operators." Area Operators in turn market and sell purported unit franchises to individuals, like Plaintiff and Class Members,

---

[8]  *Id.*
[9]  *The Typology of Modern Slavery: Defining Sex and Labor Trafficking in the United States*, POLARIS, 54 (Mar. 2017) (https://polarisproject.org/sites/default/files/Polaris-Typology-of-Modern-Slavery.pdf)
[10]  *Id.*
[11]  *Id.* at 43-45.
[12]  Zhang, Sheldon X, *Looking for a Hidden Population: Trafficking of Migrant Laborers in San Diego County,* 12: San Diego State University, 2012. Available at https://www.ncjrs.gov/ pdffiles1/nij/grants/240223.pdf.
[13]  *Id.* at 12-13.

1  who perform the cleaning and janitorial services for CleanNet's commercial customers, including

2  offices, schools, health care facilities, banks, airports, and industrial sites. D&G is one such Area

3  Operator.

4       26.    CleanNet USA exercises governing authority by directly supervising D&G and

5  other Area Operators.  CleanNet USA sets national standards and policies for franchise

6  agreements, franchise fees, branding, equipment, supplies, and cleaning services for its Area

7  Operators. CleanNet USA provides Area Operators with the standard "franchise agreements,"

8  sales materials, disclosure documents, operating manuals, periodic training, sample pricing for

9  customer accounts, automated scheduling, and fully integrated business software.  CleanNet USA

10  directs how Area Operators bill clients and collect fees.  CleanNet USA provides a program to

11  Area Operators for obtaining insurance and bonding.  Further, all Area Operators, including

12  D&G, are included within CleanNet USA's general company website for the purposes of

13  marketing, corporate information, and soliciting cleaning services."

14       27.    CleanNet's approach and business model has been extremely profitable.

15  According to Entrepreneur magazine, between 2010 and 2012, CleanNet was one of the top ten

16  fastest growing franchisors in the nation; in 2015, CleanNet reported approximately 3,000

17  franchises nationwide.

18       **D.**     **Defendants Induced Plaintiff and Class Members to Invest in Franchises**
19             **through Deceptive Promises.**

20       28.    In order to sell franchises, CleanNet, through its Area Operators, paints an alluring

21  picture of business ownership, including the autonomy, flexibility, and good income that comes

22  with such ownership.  CleanNet promises franchisees a long-term partnership with many

23  purported benefits: operating under the name of the established janitorial brand CleanNet; being

24  provided with a set of customer accounts; and having their advertising and marketing taken care

25  of by CleanNet.  In reality, in purchasing a janitorial franchise, Plaintiff and Class Members

26  received nothing more than an unstable low-paying janitorial job at great expense.

27       29.    Despite Defendants' promises, buying a franchise does not guarantee customer

28  accounts or even assistance in finding new accounts.  Rather, CleanNet's business structure

encourages the selling of new franchises rather than supporting existing ones.

30.     CleanNet's marketing tactics are rife with deceptive practices.  Upon information and belief, CleanNet, in purporting to present information about its franchises, routinely and as a matter of policy made, and continues to make, untrue and/or misleading statements and omits pertinent information about CleanNet franchises in order to sell franchises, including gross and willful misrepresentations regarding the work conditions and potential earnings.

31.     For instance, at the time Plaintiff purchased the purported franchise, CleanNet did not disclose to Plaintiff that it could not provide sufficient customer accounts to meet the monthly earnings promised to Plaintiff, nor did CleanNet disclose that it routinely terminates its customer accounts without cause and on false pretenses, or that Plaintiff would have very little control over his hours or pay.  Upon information and belief, Class Members were provided with substantially similar material misrepresentations and/or omissions.  CleanNet engages in this deceptive behavior knowingly and intentionally to induce individuals to purchase franchises.

32.     Further, the written terms of the CleanNet franchise agreements reinforce these false assertions and guarantees, most notably by promising a certain amount of monthly income and sufficient business to satisfy the terms of the franchise agreements.

33.     CleanNet convinces interested individuals that the cost of their large down payment will be quickly recouped with profit from their "franchise."  Despite regularly marketing and selling franchises to immigrant communities and non-native English speakers, CleanNet presents the franchise agreement and other documents only in English and does not actually translate word-for-word the dense legal contents.  Instead, CleanNet presents dense and voluminous legal documents in English only with limited explanation, and reassurances designed to encourage quick purchasing.

34.     Further, CleanNet has a practice of rushing and pressuring Class Members to purchase franchises, and discouraging them from thorough review of the dense legal contracts.

35.     Based on the promises and representations made by CleanNet, Plaintiff and Class Members invested their time and significant financial resources, in pursuit of these supposedly desirable opportunities for business ownership.

**E.      The Financing of the Franchise Purchase through Substantial Down Payments and Loans from D&G.**

36.      CleanNet offers a variety of franchise packages for different prices and fees, ranging from $2,950 to $83,000, with each package guaranteeing a specified amount of monthly gross billings, as set forth in its "fee schedule." The fee schedule encourages financing with the company through high down payments and a loan from D&G with fixed extended monthly payments.

37.      In order to secure a loan from D&G for the balance of the franchise fee, Plaintiff and Class Members must sign a promissory note and guaranty to D&G, which include the company's right to demand full payment for the balance of the loan at any moment and the company's right to enforce such loans in court upon default.

38.      For example, Plaintiff paid $8,500 -- nearly his life savings -- as a down payment for the franchise. For the $5,000 balance of the purchase price, Plaintiff took out a loan from D&G which would accrue 9% annual interest and would be repaid in monthly installments over the course of three years. Upon information and belief, CleanNet induced Class Members to make similar investments for down payments, together with loans for the balance of the purchase price.

**F.      Plaintiff and Class Members Were Forced to Provide Labor and Services for Defendants under Terms and Conditions Substantially Worse Than Those Promised.**

39.      In direct contradiction to promises made to Plaintiff and Class Members, CleanNet's business model enables it to control virtually every aspect of how Plaintiff and putative class members provide janitorial services to its customers, and makes it nearly impossible for Plaintiff and putative class members to earn the supposedly guaranteed monthly income.

40.      For example, CleanNet determines where Class Members provide cleaning services, the pay Class Members will receive, the amount of work involved, and the time when services are to be provided. When Class Members are told to show up at a particular location, they must accept or reject the offer to work at the site before entering the space to see how much work is involved. If a Class Member decides not to work at the site chosen by CleanNet,

CleanNet has no obligation to replace that customer with another, thus putting further pressure on a Class Member to accept whatever site and work assignment are given, regardless of the pay and the time required to complete the assignment.

41.     CleanNet negotiates customer contracts for janitorial services and sets the price for those services. Upon information and belief, CleanNet chronically underbids its cleaning contracts with commercial clients.  Once a customer account has been assigned to a Class Member, the Class Member is powerless to renegotiate the price or terms, even, for example, when it becomes clear that the per-hour pay for cleaning services is extremely low or below the minimum wage.

42.     Further, CleanNet has a policy and practice of estimating completion times for each cleaning service. Upon information and belief, CleanNet uniformly underestimated and continues to underestimate the time necessary to clean.  In addition, CleanNet and its clients required Plaintiff and continues to require Class Members to perform additional work, beyond the services listed in CleanNet's boilerplate contract for its accounts, but does not pay for this work.  CleanNet and its clients were and are able to exploit Plaintiff and Class Members knowing that they have no other choice but to perform additional work.

43.     CleanNet's policies and practices of underbidding commercial contracts and under-estimating cleaning times resulted, and continue to result, in Plaintiff and  Class Members often earning significantly less than the state – or where applicable, a local – minimum wage or overtime wages for their work.

44.     CleanNet also maintains control of and responsibility over all aspects of customer relations, including fielding customer complaints. As a result, Class Members will be unaware that a complaint has been made until such information is brought to their attention by CleanNet. CleanNet controls the response to any complaints, deciding whether to permit the class member to cure its supposedly defective service, or whether instead to terminate that Class Member's assignment with that customer.  CleanNet's complaint procedure compelled Plaintiff, and continues to compel Class Members, to succumb to additional work demands from CleanNet's

clients, in constant fear that any refusal will lead to a termination of that assignment and even lower monthly earnings.

45.    In addition, CleanNet has a policy and practice of deducting from the earnings of Plaintiff and Class Members several high monthly fees and charges, including but not limited to royalty fees, management fees, and franchise fees, further reducing their minimal earnings.

46.    Upon information and belief, based on the work conditions outlined above, and due to the fees and loan repayments charged by CleanNet, Plaintiff and Class Members sometimes earned almost nothing for the labor and services they performed.

**G.    Defendants Maintained Plaintiff's and Class Members' Labor and Services through Threatened Serious Harm.**

47.    For their own benefit, CleanNet ignored the oral promises made regarding franchise ownership, and the terms of the written franchise agreements, and instead treated Plaintiff and Class Members as an easily exploitable source of janitorial labor for CleanNet's clients.

48.    CleanNet preyed upon Plaintiff's and Class Members' vulnerability by creating a scheme in which Class Members invested large sums to purchase CleanNet franchises, became indebted to CleanNet, and could not stop working without facing the specter of serious financial, reputational, and/or psychological harm.

49.    Based on the false promises made by CleanNet, Plaintiff reasonably believed that investing in a franchise would result in decent long-term work and a stable monthly income. However, after over a year and a half of working long hours (and making regular payments to CleanNet), Plaintiff's actual income was sporadic, and typically fell far short of the monthly amount that he had been guaranteed with his franchise package.  Despite earning significantly less than what had been guaranteed, Plaintiff still had to pay the monthly installments per his promissory note.   Upon information and belief, Class Members were also required to make monthly installment payments despite not receiving the income guaranteed by the franchise package.

50.    Even when Plaintiff began earning more after the first two years of work, he was

still earning less than the promised amount, and significant portions of his pay were withheld by CleanNet in the forms of administrative and royalty fees.

51.     Due to CleanNet's scheme, Plaintiff and Class Members reasonably felt coerced to provide labor and services to CleanNet, simply to make ends meet and in order to keep up with the fees and loan repayments deducted directly from their earnings.

52.     Further, Plaintiff and Class Members were required to work significantly more hours than CleanNet's representations had led them to expect, especially since CleanNet uniformly underestimated the time necessary to clean and since CleanNet clients often demanded additional work.

53.     CleanNet regularly took away or decreased Plaintiff's accounts and work assignments, either because he was only assigned to them temporarily, or because Plaintiff declined to renew them because he was not paid for additional services rendered.  CleanNet's policy is to not provide more business when work is declined, regardless of the reason for declining. Instead, CleanNet demanded more money from Plaintiff to "upgrade" his package in order to provide him with more business and earnings potential.

54.     Plaintiff was repeatedly threatened by D&G that he could not complain or stop working, or he would lose everything he had invested. In addition to losing his initial investment, Plaintiff would still have significant debt to repay.  Under these circumstances, Plaintiff reasonably believed that he had no choice but to continue providing janitorial services. Plaintiff's reasonable fear of this serious financial harm compelled him to continue working for CleanNet.

55.     When Plaintiff complained about the false promises made and the terms and conditions of his work, D&G told Plaintiff that he should be careful if he did not want to lose everything.  Plaintiff reasonably understood this to be a threat regarding legal and financial consequences if he continued complaining.

56.     Upon information and belief, D&G threatened Plaintiff and Class Members with serious harm, both directly and indirectly, including for example threats of losing their entire

investments and even threats of lawsuits against them if they stopped working without repaying their debt.

57.     CleanNet's scheme further caused Plaintiff and Class Members to reasonably believe that they would suffer serious reputational and psychological harm if they stopped working for CleanNet and broke their franchise agreements, including difficulty in finding new work opportunities, and the stress and anxiety of losing large sums of money and having a large outstanding debt.

58.     Having invested substantial personal savings to purchase franchises, and being further indebted to CleanNet for a prolonged period, Plaintiff and Class Members found themselves victims of CleanNet's scheme, locked into low-paying janitorial jobs that they could not voluntarily leave without enduring serious harm.

**H.     CleanNet's Continuing Conduct**

59.     Upon information and belief, CleanNet's conduct as alleged herein is continuing, and as a result Class Members continue to be the victims of labor trafficking.

## CLASS ALLEGATIONS

60.     Plaintiff brings the trafficking claims alleged herein on behalf of himself and a class of similarly situated individuals. The proposed Class is defined as:

> All individuals who financed the purchase of a purported franchise from Defendants by receiving a loan from D&G, and performed, or are performing, janitorial services in California on behalf of Defendants at any time during the period from at least ten years prior to the filing of the original complaint in this action through the present.

61.     The requirements of Rule 23(a)(1)-(4) are satisfied as follows:

A.     Rule 23(a)(1) – Numerosity. The precise number of individuals in the class is known only to Defendants, but based on the information available to Plaintiff, the number of Class Members is believed to include at least 200 individuals.

B.     Rule 23(a)(2) – Commonality. This action presents questions of law common to the class, including:

1     i.   Whether Defendants' conduct violated the forced labor and trafficking

2         provisions of the TVPRA (18 U.S.C. §§ 1581, 1589, 1590, and 1593A);

3     ii.  Whether Defendants' acts were intended to deprive the personal liberty of

4         Plaintiff and putative class members with the intent to obtain and maintain

5         forced labor through coercion, through force, fear, fraud, deceit, coercion,

6         violence, duress, menace, or threat of unlawful injury within the meaning

7         of California Penal Code section 236.1.

8     iii.  The nature of damages available to Plaintiff and Class Members, including

9         the applicability of compensatory and/or punitive damages.

10    This action involves questions of fact common to the class, including:

11     i.   Whether Defendants threatened, directly or indirectly,  Plaintiff and Class

12         Members  with serious harm, and/or abuse of the legal process in order to

13         obtain Plaintiff's and  Class Members' labor and  services;

14     ii.  Whether Defendants' scheme, plan or pattern was intended to cause Plaintiff

15         and Class Members that if they did not provide labor and services to

16         Defendants, they would suffer serious harm;

17     iii.  Whether Defendants obtained and/or provided labor and services from

18         Plaintiff and Class Members through the abuse or threatened abuse of law or

19         legal proess;

20     iv.  Whether Defendants recruited, obtained and/or provided Plaintiff and Class

21         Members for the purpose of subjecting them to forced labor;

22     v.   Whether Defendants knowingly benefitted from participating in a venture

23         that Defendants knew or should have known was engaged in providing

24         and/or obtaining Plaintiff's and Class Members' labor or services through

25         serious harm, and/or abuse of the legal process and/or the threat of serious

26         harm, and/or abuse of the legal process;

27     vi.  Whether Defendants knowingly benefitted from participating in a venture

28         that Defendants knew or should have known was engaged in the

recruitment, harboring, transporting, obtaining and/or providing Plaintiff and other putative class members for the purpose of subjecting them to forced labor; and

vii.  The source and amount of Plaintiff's and Class Members' damages.

C.  Rule 23(a)(3) – Typicality. Plaintiff's claim is typical of the claims of Class Members because they have suffered the same injuries and seek the same form of relief. In addition, Plaintiff's claims are not subject to unique defenses.

D.  Rule 23(a)(4) – Adequacy. Plaintiff will fairly and adequately represent and protect the interest of the class. Plaintiff has no conflicts of interest with the members of the class. Plaintiff is committed to obtaining relief for class members. Plaintiff  is represented by competent counsel experienced in handling class action litigation and are prepared to advance costs necessary to vigorously litigate this action.

62.  The class action claims are appropriately certified under Rule 23(b)(3) because common questions of law and fact relevant to the claims for relief, as identified above, predominate over any pertinent questions involving only individual members. A class action is superior to other available methods of adjudicating the claims set forth in the claims for relief because, *inter alia*:

a.  Common issues of law and fact, as identified in part above, substantially diminish the interest of putative class members in individually controlling the prosecution of separate actions;

b.  The Class Members lack the means and/or resources to secure individual legal assistance and/or and are likely to be unaware of their rights to prosecute these claims; and

c.  A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized practices with regards to the false and deceptive promises and the financing of loans as alleged herein.

## FIRST CAUSE OF ACTION
### (Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595)

63.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

64.     Plaintiff brings this claim on behalf of himself and all other similarly situated individuals against Defendants.

65.     Plaintiff is authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA), 18 U.S.C. § 1595.

66.     Plaintiff is a victim of forced labor and human trafficking in violations of Title 18 U.S.C. §§ 1581, 1589, 1590, and 1593A.

67.     Defendants held Plaintiff and Class Members in a condition of compulsory service in payment of a debt, in violation of 18 U.S.C. § 1589.

68.     By taking out loans to finance the purchase of purported franchises, Plaintiff and Class Members became indebted to CleanNet.  Finding that in fact they had not purchased franchises, but had essentially been defrauded into purchasing regular janitorial jobs, Plaintiff and Class Members felt compelled to continue working for CleanNet in order to pay off their debt.

69.     Plaintiff and Class Members had not viable way to exit the debt arrangement without experiencing the threat of serious harm.  For example, Plaintiff's only options would have been to downgrade his franchise package, which would have meant earning even less and potentially prolonging his cycle of debt, or somehow selling his franchise package, which would have been impossible given the remaining debt and low earnings.  Therefore, Class Members, under all the foregoing circumstances, would reasonably have felt compelled to work for CleanNet to pay off their debt.

70.     Defendants attempted to and did subject Plaintiff and Class Members to forced labor in violation of 18 U.S.C. § 1589.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

71.     Defendants knowingly obtained the labor and services of Plaintiff and Class Members through serious harm and threats of serious harm, including serious financial harm, in violation of 18 U.S.C. § 1589(a)(2).  Defendants induced Plaintiff and Class Members to invest large sums of money to purchase franchises under the pretense of false promises and willful misrepresentations, and then used loan agreements and low earnings to keep Plaintiff and Class Members in a condition of financial vulnerability so that they had no choice but to labor for Defendants or else face the threat of serious financial, reputational, and/or psychological harm.

72.     Defendants further threatened Plaintiff and Class Members with abuse of law or the legal process, including but not limited to threats that they would face lawsuits if they stopped working prior to paying off their debts to Defendants, in violation of 18 U.S.C. § 1589(a)(3).

73.     In violation of 18 U.S.C. § 1589(a)(4), Defendants knowingly obtained the labor and services of Plaintiff and Class Members by means of a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce, and did coerce, Plaintiff and  Class Members to believe that they would suffer serious harm if they were to stop providing labor and services to Defendants.  Specifically, Defendants' scheme included the a selling of franchises under false and fraudulent terms, meant to induce Plaintiff and Class Members to invest large sums of money and incur substantial debt to purchase such franchises; and material changes and breaches to the promises made regarding franchise ownership, such that Plaintiff and Class Members had no choice but to work for Defendants under unlawful conditions to which they never agreed.

74.     Defendants knowingly recruited and/or obtained the Plaintiff and Class Members for labor or services in violation of laws prohibiting involuntary servitude and/or forced labor, in violation of 18 U.S.C. § 1590.

75.     Alternatively, each Defendant knowingly benefitted financially, and/or by receiving the value of Plaintiff's and Class Members' janitorial services, through their participation in a venture which each Defendant knew or should have known was engaged in violations the TVPRA, or in reckless disregard of the fact that the venture was engaged violations of the TVPRA, in violation of sections 1589, 1593A, and 1595.

76.     As a result of their participation in such venture, Defendants were to receive, and did knowingly receive, numerous benefits including:

    a.  Fees and profit associated with the purchases of the franchises;

    b.  Royalty and administrative fees associated with franchise ownership;

    c.  Interest associated with the loans taken by Plaintiff and Class Members in order to purchase franchises; and

    d.  The profit and benefit of offering vulnerable and easily exploitable janitorial labor to Defendants' clients.

77.     Accordingly, Plaintiff and Class Members request that the Court issue declaratory relief declaring Defendants' practice(s) involving coercing Plaintiff and Class Nembers to perform labor and services under the conditions outlined above illegal and unlawful.

78.     Plaintiff and Class Members suffered injury as a proximate result of these actions.

79.     Plaintiff and Class Members are entitled to compensatory damages in an amount to be determined at trial.

80.     Plaintiff and Class Members are entitled to punitive damages because of Defendants' malice, oppression, fraud, or duress in committing the act of human trafficking.

81.     Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION
**(Violation of the California Trafficking Victims Protection Act, Cal. Civ. Code § 52.5)**

82.     Plaintiff individually, and on behalf of the Class, incorporates by reference as though fully set forth herein the preceding paragraphs of this Complaint.

83.     The California Trafficking Victims Protection Act, codified at Cal. Civ. Code § 52.5, provides, *inter alia*, that:

    (a)  "A victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief. A prevailing plaintiff may also be awarded attorney's fees and costs."

(b) "In addition to the remedies specified herein, in any action under subdivision (a), the plaintiff may be awarded up to three times his or her actual damages or ten thousand dollars ($10,000), whichever is greater. In addition, punitive damages may also be awarded upon proof of the defendant's malice, oppression, fraud, or duress in committing the act of human trafficking."

84.     Cal. Penal Code § 236.1(a) provides: "Any person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking …"

85.     Cal. Penal Code § 236.1 also provides in relevant part:

(g) "The Legislature finds that the definition of human trafficking in this section is equivalent to the federal definition of a severe form of trafficking found in Section 7102(8) of Title 22 of the United States Code."

(h) For purposes of this chapter, the following definitions apply:

(1) "Coercion" includes any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; the abuse or threatened abuse of the legal process; debt bondage; or providing and facilitating the possession of any controlled substance to a person with the intent to impair the person's judgment."

(3) "Deprivation or violation of the personal liberty of another" includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."

(4) "Duress" includes a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed…."

(5) "Forced labor or services" means labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person."

(8) "Serious harm" includes any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor, services, or commercial sexual acts in order to avoid incurring that harm."

86.     As alleged herein, Plaintiff and Class Members were coerced to perform labor and services for Defendants by means of:

    a.   serious financial harm and threats of serious harm; and/or

    b.   the abuse and threatened abuse of law or legal process to Plaintiff and Class Members; and

    c.   a scheme, plan, pattern, and uniform policy intended to cause Plaintiff and Class Members to believe that, if they did not perform such labor, that they would suffer serious harm.

87.     Defendants reduced their labor costs and expenses, and increased their profits, through their fraudulent scheme to coerce Plaintiff and Class Members to labor on their behalf. Defendants therefore knowingly and financially benefitted from participation in a venture, plan, scheme, pattern of conduct, and practice they  knew, or should have known, were unlawful and in violation California forced labor laws. Cal. Civ. Code § 52.5.

88.     Accordingly, Plaintiff and Class Members request that the Court issue declaratory relief declaring Defendants' practice(s) involving coercing Plaintiff and class members to perform labor and services under threat of serious harm to be illegal and unlawful.

89.     As a direct and proximate result of Defendants' actions, Plaintiff and Class Members have suffered actual and compensatory damages in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

90.     Pursuant to Cal. Civ. Code § 52.5(a), Plaintiff and Class Members are entitled to punitive damages because of Defendants' malice, oppression, fraud, or duress in committing the act of human trafficking.

91.     Pursuant to Cal. Civ. Code § 52.5(b), Plaintiff and Class Members are entitled to an award of up to three times their actual damages.

92.     Plaintiff and Class Members are entitled to recover their reasonable attorneys' fees and costs pursuant to Cal. Civ. Code § 52.5(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief for himself and on behalf of the Class and Class:

    a.   That the Court certify Certifying Plaintiff's claims in this action as class claims pursuant to Federal Rule of Civil Procedure 23;

    b.   That the Court designate the Plaintiff as class representatives pursuant to Federal Rule of Civil Procedure 23, and designating counsel for Plaintiff as counsel for the class;

    c.   That the Court find and declare that Defendants acts and practices as alleged herein are, illegal;

    d.   That the Court award restitution, damages, treble damages, and punitive damages to Plaintiff and Class Members in an amount to be determined at trial;

    e.   That the Court grant costs of suit, including reasonable attorneys' fees, costs, and expenses; and

    f.   That the Court grant all such other relief as the Court deems just and proper.

///
///
///
///
///
///

SECOND AMENDED CLASS ACTION COMPLAINT

1   Dated:  October 22, 2018                    Respectfully Submitted,

2                                               Mana Barari
3                                               Carole Vigne
                                                Henry Hewitt
4
5                                               LEGAL AID AT WORK

6
7
       By
8            _____
             MANA BARARI
9

10

11                      **DEMAND FOR JURY TRIAL**

12        Plaintiff hereby demands a trial by jury of each and every cause of action so triable.

13

14   Dated:

15                                               Mana Barari
                                                Carole Vigne
16                                               Henry Hewitt
                                                LEGAL AID AT WORK
17

18

19
       By
20           _____
             MANA BARARI
21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT