UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LUIS CASTILLO,

    Plaintiff,

v.

CLEANNET USA, INC., et al.,

    Defendants.

Case No. 17-cv-07277-JCS

**ORDER DENYING MOTION TO COMPEL ARBITRATION**

Re: Dkt. No. 65

## I.    INTRODUCTION

Plaintiff Luis Castillo brings a putative class action against Defendants CleanNet USA, Inc. ("CleanNet") and D&G Enterprises, Inc. dba CleanNet of the Bay Area and CleanNet of San Jose ("D&G"), asserting claims under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1959, and the California Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5.[1] Defendants bring a Motion to Compel Arbitration and Stay the Proceeding ("Motion") based on an arbitration provision in the franchise agreement between D&G and Castillo. The Motion has been fully briefed and the Court has permitted Castillo to file a sur-reply and supplemental evidence to respond to new evidence and arguments filed by Defendants with their Reply brief. A hearing on the motion was held on December 7, 2018 at 9:30 a.m. For the reasons stated below, the Motion is DENIED.[2]

---

[1] The parties engaged in mediation and were able to resolve their disputes regarding other claims asserted by Castillo in this action, leaving only the two trafficking claims in the case. *See* Docket No. 68 (Stipulation of Dismissal of Claims 1-8).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.   BACKGROUND

### A.   Factual Background[3]

Luis Castillo entered into a franchise agreement ("Franchise Agreement") with D&G on September 26, 2011.  Declaration of David P. Crum in Support of Defendants CleanNet USA, Inc. and D&G Enterprises, Inc.'s (d/b/a CleanNet of the Bay Area and CleanNet of San Jose) Motion to Compel Arbitration and Stay Proceedings ("Crum Decl.") ¶ 4 & Ex. A.  D&G is "an area operator licensed by CleanNet USA to sell franchises and to operate a franchising business using the CleanNet USA® registered marks and proprietary system in the San Francisco Bay area."  *Id.* ¶ 3.  To purchase the franchise, Castillo made a down payment of $8,500 and signed a promissory note for $5,000 on the day he signed the Franchise Agreement. Declaration of Luis Castillo in Support of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration ("Castillo Decl.") ¶ 14; Crum Decl., Ex. B (Promissory Note).

The Franchise Agreement contains a section entitled "Dispute Resolution" that provides, in relevant part, as follows:

### XXII.  DISPUTE RESOLUTION

The parties to this Agreement recognize that compliance with the terms of this Agreement and the nature of the Franchisor/Franchisee relationship may give rise to the need to resolve disputes between the parties. Both Franchisee and Franchisor wish to avoid the time, expense and disruption that can result from lawsuits, but they desire to have a method of resolving disputes that is mutually acceptable. For this purpose, the parties expressly agree first to resolve disputes by direct negotiation with each other. If such negotiations fail to reach an agreement, the party dissatisfied with the outcome of negotiations must submit the dispute, within 180 days, to mediation and/or arbitration under this Section XXII, as follows:

**A.      Mediation**: Before, and as a necessary condition precedent to, filing a demand for arbitration in accordance with this Agreement, Franchisee and Franchisor shall attempt to settle the dispute through mediation administered by the American Arbitration Association ("AAA") at its office closest in proximity to Franchisor's office in accordance

---

[3]The parties have offered declarations and other evidence to support their versions of the facts, some of which are in dispute.  Because the Court is required to weigh evidence and make factual findings in connection with Defendants' Motion, the Court DENIES Plaintiff's request that the evidence offered in support of Defendants' reply brief be stricken.  *See* Docket No. 72.  Instead, the Court has permitted Castillo to file a sur-reply and offer his own evidence to rebut Defendants' new evidence.

with the Commercial Mediation Rules of the AAA. The filing fee for the proceeding shall be borne by the initiating party. The mediator's compensation and any administrative costs shall be borne equally by both parties. If Franchisee and Franchisor arrive at an agreement through mediation, then that agreement shall be set forth in writing and be binding upon both parties.

      **B.**    **<u>Arbitration</u>:** All disputes, controversies, and claims of any kind arising between the parties, including but not limited to claims arising out of or relating to this Agreement, the rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party that are unable to be settled through mediation shall be settled by arbitration administered by the AAA at its office closest in proximity to the Franchisor's office, in accordance with the Federal Arbitration Act and the Commercial Rules of the AAA unless the parties otherwise agree in accordance with Section XXII.C of this Agreement.

1. This Section XXII.B shall survive expiration, non-renewal or termination of this Agreement for any reason.

2. The filing fee for the proceeding shall be borne by the initiating party. The arbitrator's compensation and any administrative costs shall be borne equally by both parties.

3. Either party shall have the right to seek a court order granting injunctive relief where such relief is necessary in order to provide protection on a temporary or preliminary basis while the arbitration process is pursued.

4. The parties expressly agree that an arbitrator shall have the power to enter an award, including injunctive relief, protecting its rights to the same extent a court could do so, and such relief shall be enforceable by a court having jurisdiction under Section XXII.E of this Agreement.

5. No arbitration or action under this Agreement shall include, by consolidation, joinder, or any other manner, any claims by any person or entity in privity with or claiming through or on behalf of Franchisee. Franchisee shall not seek to arbitrate or litigate as a representative of, or on behalf of, any other person or entity, any dispute, controversy of any kind arising out of or relating to this Agreement, the rights and obligations of the parties, the sale of the franchise, or other claims or causes of action relating to the performance of either party to this Agreement.

6. To the fullest extent permitted by law, direct negotiation, followed by mediation and/or binding arbitration, shall be the exclusive means of resolving any and all claims relating to this Agreement, including, but not limited to, claims of breach of contract, breach of the covenant of good faith and fair dealing, fraud, violation of any and all franchise registration, disclosure and/or franchisee protection statutes, regulations, or ordinances, whether federal, state or local, or any other common laws claims.

**C.** **Alternative Procedures:** The parties understand that specific disputes may make some flexibility in the foregoing dispute resolution procedures desirable. The parties may modify any of the negotiation, mediation or arbitration procedures as described below, or in any other manner that is mutually agreed:

1. Dispute Resolution Procedural Rules. Either party may propose to use a dispute resolution organization other than the AAA, if the proposed organization has rules governing proceedings that are comparable in scope and formality to the AAA Commercial Rules. Under no circumstances shall either of the parties seek to proceed under the AAA Employment Arbitration Rules. The parties may also agree to use a private mediator or arbitrator who would then operate in accordance with the AAA Commercial Rules or a comparable set of rules.

. . .

Crum Decl., Ex. A at ECF pp. 41-42. Section XXII also provides for waiver of punitive damages, stating:

> FRANCISEE HEREBY IRREVOCABLY WAVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM FOR ANY PUNITIVE, EXEMPLARY, CONSEQUENTIAL, OR SPECULATIVE DAMAGES INCLUDNG, WITHOUT LIMITATION, LOSS OF PROFITS, AND AGREES THAT, IN THE EVENT OF A DISPUTE, FRANCISEE SHALL BE LIMITED TO THE ACTUAL DAMAGES SUSTAINED EXCEPT AS OTHERWISE PROVIDED HEREIN.

*Id*. (Section XXII(G)).

Finally, Section XXII contains a savings clause stating that "[i]f any provision of this Section XXII would violate applicable state or federal law, then the parties agree that such provision shall be excluded from the terms of this Agreement, or shall be modified to the minimum extent necessary to make the terms hereof lawful." *Id*. at ECF p. 82 (Franchise Agreement, Section XXII(F)). Likewise, the Franchise Agreement contains a separate severability provision that provides as follows:

> Except as expressly provided to the contrary herein, each section, part, term and/or provision of this Agreement shall be considered severable, and any section, part, term and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect on, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto, and said invalid sections, parts, terms and/or provisions shall be deemed not to be a part of this Agreement; provided, however, that if Franchisor determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement,

Franchisor, at its option, may terminate this Agreement.

*Id*. at ECF p. 83 (Franchise Agreement, Section XXIV(A)).

The Franchise Agreement also contains a provision addressing the use of English

language, which states as follows:

> **English Language:** Franchisee acknowledges that Franchisor's disclosure document and this Agreement are written in the English language. If English is not Franchisee's native language, Franchisee warrants and represents that Franchisee has had the opportunity for translation of the disclosure document and this Agreement; that all aspects of this Agreement have been explained to Franchisee's satisfaction; and that Franchisee understands and accepts this Agreement as written. Franchisee warrants and represents that Franchisee can in fact conduct business in the English language and that conducting business in the English language does not constitute an undue burden on Franchisee.

*Id*. at ECF pp. 78-79 (Franchise Agreement, Section XXI(D)).

As discussed below, the Franchise Agreement was provided to Castillo as part of a package of documents called "Franchise Disclosure Documents," which included, among other things, a summary of the provisions of the Franchise Agreement. *See* Castillo Decl., Ex. A at ECF pp. 30-32. Item 17(u) on this summary lists "Dispute resolution by arbitration or mediation," which is summarized on the chart as follows: "Provides for binding arbitration after mediation and negotiation by the parties." *Id*. at ECF p. 32. Another document in the Financial Disclosures Document, entitled "California Addendum to Disclosures Document," appears to add an additional term to the dispute resolution section of the Franchise Agreement, stating, in part, as follows:

> Item 17(u) of this disclosure document is modified to include the following paragraph:
>
> The franchise agreement requires binding arbitration. The arbitration will occur at the offices of the American Arbitration Association nearest our home office, with costs being paid by the party which does not substantially prevail. You are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure 1281, and the Federal Arbitration Act) to any provisions of the franchise agreement restricting venue to a forum outside of the state of California.

Castillo Decl., Ex. A (Franchise Disclosure Documents) at ECF p. 40 ("Addendum").

Castillo does not dispute that he signed the Franchise Agreement and also initialed each

page of it, including the pages containing the dispute resolution provision.[4]  However, there are factual disputes about the circumstances under which he signed the Franchise Agreement and whether he understood what he was agreeing to.  In support of his Opposition brief, Castillo supplied a declaration in which he describes the circumstances as follows:

> 3.  Spanish is my primary language. I have a high school diploma but do not hold a college degree. I never owned a business, nor had I been trained in owning a business, prior to purchasing the CleanNet franchise.
>
> 4.  Prior to purchasing a CleanNet franchise, I worked as a janitor for over ten years.  My yearly salary was approximately $35,000.
>
> 5.  I learned about purchasing a CleanNet franchise from a Spanish magazine ad in approximately 2011. At the time, I had been laid off for approximately six months and desperately needed work to support my wife and our four children.
>
> 6.  I called CleanNet and spoke with an employee of CleanNet named Vilma Vega. A few days later, I met her in person in Oakland, California. Vilma was eager to sell me a CleanNet franchise. Vilma promised I could earn $3,000 every month, and I would have the support of the company. I grew excited about the franchise opportunity.
>
> 7. All of my communications with Vilma over the phone had been in Spanish, and  in our person meeting was also all in Spanish.
>
> 8.  Soon after our first meeting, I returned to Oakland and Vilma gave me a large stack of documents. Attached to this declaration as Exhibit A is a true and correct copy of the documents I received from Vilma in approximately September 2011.
>
> 9.  None of the documents I received were in Spanish, and I was not able to read and comprehend the documents presented to me in English. Though I knew a few simple phrases, I was not capable of understanding the English, particularly the legal terminology, contained in documents. I had to rely upon Vilma to explain the documents to me. Vilma gave me some brief explanations and purported translations of what I was signing: this page says this, that page says that. Vilma told me I needed to sign everything in order to get the franchise, and she showed me where to write my initials and where to sign with post-it arrow flags. I felt pressured to sign right there and then. I was not given the option of taking it home to review with someone else.
>
> 10.  I was not aware of any dispute resolution or arbitration provisions that were included within the contract that I signed; Vilma did not explain any of this prior to having me sign. I did not understand that I was giving up my right to present any legal claims in a court. I would have not agreed to this had I known.

---

[4] He did not, however, sign or initial the Addendum.

11.  I was also not aware that there was a part of the agreement that I signed that I said I was capable of conducting business in English. I would not have agreed to such a statement.

12.  I was presented with a franchise agreement on take it or leave it terms. I did not believe I could negotiate or alter any of the terms of the agreement, and I was not given an opportunity to do so.

13.  My second meeting with Vilma, including signing and initialing all documents, lasted about 1 hour. I was promised that everything was legitimate, and that I did not have anything to worry about. I trusted the promises made to me by Vilma. I thought I was dealing with a large and reputable company. I was convinced my life was going to change for the better.

14.  I paid the $8,500 down payment towards the franchise on the same day that I signed the contract and a promissory note for the difference of $5,000. This amount for the down payment was most of my life savings.

15.  Currently, I earn approximately between $35,000 and $40,000 a year. My income goes almost entirely to cover our family's life necessities, like rent, food, etc., and does not permit me to save very much money. If I had to pay for arbitration of my claim, it would be a financial hardship to do so.

Castillo Decl., ¶¶ 3-15.[5]

Defendants have not offered any evidence that contradicts Castillo's account of his interactions with Vilma Vega.  In particular, they do not challenge the truth of Castillo's statements that all of his conversations with Vega were in Spanish and or that when he signed the Franchise Agreement Vega "gave [him] some brief explanations and purported translations of what [he] was signing: this page says this, that page says that."  They also conceded at oral argument that there is no evidence in the record that contradicts Castillo's statement that Vega did not tell him that the Franchise Agreement contained an arbitration provision.[6]  Instead, Defendants contend that Castillo had a reasonable opportunity to discover the terms of the contract, including

---

[5] Castillo's declaration was accompanied by a declaration by Aldo Esparza, a legal assistant at Legal Aid who is fluent in English and Spanish, stating that Esparza translated Castillo's declaration into Spanish for Castillo and that Castillo verified that all of the facts contained therein are true and accurate.  *See* Esparza Decl., Docket No. 70-3.

[6] Nor were Defendants able to represent to the Court at oral argument that they were aware of such evidence.  Indeed, Defendants conceded that they had not communicated with Vega to obtain information about her interactions with Castillo in connection with the instant motion, even though Vega (who is no longer employed by Defendants) is available by telephone, according to Defendants.

the arbitration provision, and therefore, that his claim that he was induced to sign the Franchise Agreement by fraud is false. In support of their position, they offered evidence that was filed with their Reply brief that they contend shows that: 1) Castillo's English language ability is not as limited as he represents in his declaration; 2) Castillo is a savvy business owner who already owns one business and may have more financial assets than he discloses in his declaration; and 3) Castillo received a copy of the Franchise Disclosure Documents, including the Franchise Agreement, in June 2011 and therefore had time to get it translated before signing it. Below, the Court summarizes this evidence.

With respect to Castillo's ability to speak English, Defendants have offered a declaration by Andrew Kaska, who was employed by D&G and accompanied Castillo to meetings with customers who did not speak Spanish to discuss the work he was performing. Declaration of Andrew Kaska in Support of Defendants CleanNet USA, Inc. and D&G Enterprises, Inc.'s (d/b/a CleanNet of the Bay Area and CleanNet of San Jose) Reply Memorandum re Motion to Compel Arbitration and Stay the Proceedings ("Kaska Decl.") ¶ 2. According to Kaska, he observed Castillo "conversing with customers in English." *Id*. Kaska further states that his own conversations with Castillo "were in English and Spanish." *Id*. Defendants also offer an English-only multiple-choice test that Castillo completed during his franchise training, suggesting that Castillo had some ability to comprehend English. *See* Declaration of David P. Crum in Support of Defendants CleanNet USA, Inc. and D&G Enterprises, Inc.'s (d/b/a CleanNet of the Bay Area and CleanNet of San Jose) Reply Memorandum re Motion to Compel Arbitration and Stay the Proceedings ("Crum Reply Decl."), Ex. F.

Defendants also imply that Castillo is more sophisticated – and perhaps more financially well-off – than his declaration suggests. In particular, Defendants offer a business card for "J & V Maintenance" which shows that Castillo is the "owner," and a business registration certificate for J & V Maintenance. Crum Reply Decl., Exs. D & E. According to Crum, who states that he is president of D&G, Castillo "gave out" the business card "[a]t or about the time he franchised with defendants" and produced the business registration certificate as part of his initial disclosures. Crum Reply Decl. ¶¶ 9-10. Defendants also introduce evidence showing that Castillo was able to

pay $8,500 of the franchise cost when he signed the Franchise Agreement, introducing a copy of a personal check from Castillo for that amount.  Crum Reply Decl., Ex. G.

Finally, Defendants introduce evidence, in the form of a signed receipt and a subsequent acknowledgment of receipt, they contend shows that Castillo received a packet of Franchise Disclosure Documents on June 14, 2011. Crum Reply Decl., Exs. A (Receipt) & B (Acknowledgement of Receipt).  Both the Receipt and the Acknowledgment of Receipt are signed by Castillo and show a date of receipt of the Franchise Disclosure Documents – which is also handwritten on the forms – of June 14, 2011. *Id*.  According to the Receipt, the Franchise Disclosure Documents included a copy of the Franchise Agreement. *Id*.  Defendants also provide a copy of an application that appears to have been completed by Castillo; that document also is dated June 14, 2014.  Crum Reply Decl., Ex. C. Crum states in the accompanying declaration that Castillo signed all three documents on June 14, 2011 but does not state how he knows that the signatures are authentic or that the date reflected on the documents is the date they were completed.  *See* Crum Reply Decl. ¶¶ 6-7.

In support of his sur-reply, Castillo provides a supplemental declaration addressing the evidence described above.  In his supplemental declaration, Castillo states, in relevant part, as follows:

> 3. At my first meeting with a CleanNet representative, Vilma Vega, I was given very few pieces of paper. I recall a double-sided, two-page color flyer with images of janitors cleaning, advertising the CleanNet franchise, which I took home. I also remember being provided with a copy of a chart that included the different packages CleanNet offered; it listed monthly billings guarantees, total price, down payment and monthly installments. These were the only documents that I was provided and took home with me.

> 4. During our first meeting, Vilma asked me to fill out an application form. Since the form was in English, she helped me complete it by translating for me. Some of the sections, like name and address, I completed without her assistance, as I was familiar with those words. Some of the portions I completed in Spanish on her direction.

> 5. After our first meeting, Vilma called me several times to ask when I was ready to come in to review and sign the agreement with her. During our last phone call before our second meeting, she reminded me to bring a check for the down payment and to make it out to CleanNet USA. I do not recall having any written communications with Vilma.

6. At our second meeting, on or around September 26, 2011, Vilma provided me a thick packet of documents. The documents were all in English, and I asked if she had the documents translated into Spanish. She told me that the documents included the Franchise Agreement I would have to sign. She said the documents were not in Spanish, but that she would be able to provide me with oral translations. I relied on her oral translation, as I could not read the Franchise Agreement and other documents myself.

7. Vilma reviewed the Franchise Agreement and other documents with me in about an hour. She told me this section is about this, and that section says that, and so on. She pointed out where I needed to initial or sign, which was also marked with post-it arrow flags. She made the process very easy, reassuring me that it was all very straightforward. She seemed trustworthy – as did CleanNet – and so I believed her.

8. As she provided brief explanations and purported oral translations of what we were reviewing, I recall asking her some questions based on the content she shared, including how long before I would see the guaranteed monthly gross billings, and whether accounts are replaced if lost.

9. In reviewing the Agreement with me, Vilma did not mention anything regarding what would happen if l had a dispute with CleanNet, or if CleanNet had a dispute with me. She did not talk about court, or explain arbitration or anything of the type.

10. Vilma also did not mention anything about having to conduct business only in English. While I understand some janitorial words in English from working in the industry for so many years – words like clean, mop, vacuum, floor, window, toilet, garbage, recycle, compost – I otherwise have limited English proficiency.

11. Vilma did not at any time advise me to consult with an attorney or any other person about the documents she wanted me to sign. She seemed eager for me sign all the documents that very day, and so I did, with her encouragement.

12. Before the second meeting with Vilma, I had not received a copy of the Franchise Agreement. Had I been provided the document in advance, I would have brought it home and asked my oldest child, who was around 16 at the time, to translate it – or at least try to translate it – for me, as I would typically do with documents provided to me in English.

13. During my time working at CleanNet, I got by using my Spanish and some janitorial-related words in English. The CleanNet representatives I spoke with, including Vilma, Andres, and Jorge, were bilingual in English and Spanish, and I communicated with them in Spanish. I was told to not talk with CleanNet clients directly, and certainly not outside the presence of CleanNet representatives. During meetings with CleanNet clients, it was the CleanNet representative, who primarily interfaced with the client. On November 27, 2018, I met with my one of my attorneys to review the documents that were filed with the Court by CleanNet on November 20, 2018.

15. I did not recognize Exhibit A [ECF 71-3], although I can confirm that it is my signature and printed name on the page. However, I do not believe that the date is my handwriting. I understand the document suggests that I was given six kinds of documents on or about June 14, 2011, but that is not what happened. I do not recall signing any documents at my initial meeting with Vilma – except for the application form, which is Exhibit C [ECF 71-5].

16. As with Exhibit B [ECF 71-4], I can confirm that my signature is the only thing that is my handwriting on this page. I did not write the additional words on this page, and the dates also do not appear to be mine. I understand the document states that I signed the Agreement and provided a check on September 26, 2011, and that is correct. The document also states that I received a Disclosure Statement and a copy of the Franchise agreement on the same day as my first face-to-face meeting with a CleanNet representative, and that is not correct.

17. I recognize Exhibit C [ECF 71-5] as the application form I completed with the assistance of Vilma during our initial meeting. All the writing in the document is mine except for the writing in the top left corner. I wrote Spanish words like "afios" and "Casado" to complete the form because Vilma said it was fine to respond in Spanish.

18. I recognize Exhibits D [ECF 71-6] and E [ECF 71-7] as documents related to J & V Maintenance, which was a business name I created in 2008 because I needed a company name to keep getting janitorial jobs from my then-employer. I did not have any employees, but I had to invoice my employer and received 1099 tax form for the wages I received. In 2008, I had printed a few dozen business cards for J & V Maintenance, and I brought one to Vilma, upon her request, to our second meeting. I provided the Business Registration Certificate for J & V Maintenance to CleanNet in 2012 also in response to their request to provide such a document.

19. I recognize Exhibit F [ECF 71-8] as a test I had to take after buying the CleanNet franchise. I recall watching several training videos that covered the responsibilities of a janitor like myself. All the videos were in English. I asked for the Spanish version, but was told there were none. I watched the videos alone, without any translation. When the time came for my test, I asked for a copy of the test in Spanish, but again there was none. Vilma offered to help and basically told me the answers: put A there, put B there and circle true, circle false. I was able to complete the test with Vilma's assistance without needing to read any of the test. On the first page of Exhibit F [ECF 71-8], page 150, I recognize my printed name and date to be in my handwriting; on the last page of Exhibit F [ECF 71-8], page 162, I recognize the signature of my name to be in my handwriting, but not my name written above. I believe the signature below mine is of the man who was responsible for starting the training videos, but I do not recall his name. He did not speak Spanish, and so we did not say much to each other.

20. I recognize Exhibit G [Exh 71-9] as a copy of the check I wrote to CleanNet USA. The check was written at home, prior to my second

meeting with Vilma. I remember copying "Eight Thousand and Five Hundred" from a reference chart for writing numbers in English in my checkbook. At the bottom of the check I wrote in Spanish, "Pago Inicial Franquiesa de Limpieza Commercial" as I did not know how to write that in English but I wanted it to be clear what the payment was for. The payment was basically my entire li[f]e savings and a considerable sum of money for me.

21. I do not recall meeting David Crum in person or having any communication with him directly before our mediation on May 1, 2018.

22. I do not recognize the name Andrew Kaska. I had a supervisor at CleanNet whose name was Andres, and maybe it is the same individual. Andres was bilingual in English and Spanish, and we spoke almost entirely in Spanish. On a handful of occasions, Andres and I met with CleanNet clients together. Andres did the majority, if not all of the talking, with the CleanNet clients in English. After the communications, Andres pulled me aside and summarized into Spanish what had been said in the conversations with the CleanNet clients and the takeaways for me.

Castillo Supp. Decl. ¶¶ 3-22.[7]

### B.     Contentions of the Parties

In the Motion, Defendants ask the Court to order arbitration of Castillo's claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, on the basis that there is a valid and enforceable agreement to arbitrate between Castillo and D&G, that both D&G and CleanNet are entitled to invoke the arbitration agreement because they are alleged to have acted in concert, and that Castillo's claims fall within the scope of the arbitration agreement.  Castillo does not dispute that CleanNet can invoke the arbitration agreement even though it is not a signatory to the Franchise Agreement.  Nor does he dispute that the claims he asserts in the action fall within the scope of the arbitration agreement or that he can arbitrate only his individual claims and not the class claims if his claims are subject to arbitration. He argues, however, that the arbitration agreement is void – and therefore unenforceable –  because he was induced to enter into it by fraud. In particular, he asserts that he does not have sufficient understanding of English to understand the terms of the Franchise Agreement and reasonably relied on Vega's representations about what the agreement

---

[7] Castillo's supplemental declaration, like his first declaration, was accompanied by a declaration by Aldo Esparza, a legal assistant at Legal Aid who is fluent in English and Spanish, stating that Esparza translated Castillo's declaration into Spanish for Castillo and that Castillo verified that all of the facts contained therein are true and accurate.  *See* Esparza Supp. Decl., Docket No. 73-3.

said when he signed it and initialed each page.

Castillo argues further that the arbitration agreement is unenforceable because it contains numerous provisions that are unconscionable and/or violate public policy under *Armendariz v. Foundation Health Psychcare Servs., Inc*. 24 Cal. 4th 83 (2000). In particular, he argues that the arbitration agreement is unenforceable because: 1) it may require that all disputes be brought within 180 days (hereinafter, "the 180-day requirement"); 2) it provides for only minimal discovery because it applies the AAA Commercial Arbitration Rules and prohibits use of the more liberal AAA Employment Arbitration Rules; 3) it forces Castillo to pay unreasonable costs under various cost provisions in the body of the Franchise Agreement and under the provision in the Addendum that shifts costs to the losing party; and 4) it prohibits Castillo (but not Defendants) from seeking punitive damages, which would be available in court on both of his trafficking claims.

### III.  ANALYSIS

#### A.  General Legal Standard

Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "was created to counter prevalent judicial refusal to enforce arbitration agreements . . . and has been interpreted to embody 'a liberal federal policy favoring arbitration.'" *Mortenson v. Bresnan Communications*, LLC, 722 F.3d 1151, 1157 (9th Cir. 2013) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and citing *AT&T Mobility LLC v. Concepcion* ("*Concepcion*"), 563 U.S. 333, 339 (2011)). Because arbitration is a matter of contract, the question of arbitrability is, in principle, an issue for judicial determination. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). The court's role in addressing a question of arbitrability is "limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys. Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the court finds that both of these requirements are met, the FAA requires

it to enforce the provision in accordance with its terms. *Id.* In this case, it is undisputed that Plaintiffs' claims fall within the scope of the arbitration agreement. The only remaining question is whether the arbitration agreement is enforceable.

It is the burden of the party moving to compel arbitration to prove, by a preponderance of the evidence, that a valid arbitration agreement exists. *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1282 (Cal. App. 2008). If the moving party carries this burden, the opposing party must prove any contrary facts by the same burden. *Id.* ("[t]he petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense."). "In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." *Id.*; *see also Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal. 4th 394, 413 (1996) ("when a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable").

### B. Factual Findings

As a preliminary matter, the Court makes the following factual findings relevant to the circumstances under which Castillo entered into the Franchise Agreement. All of these findings are based on the preponderance of the evidence.[8]

---

[8] At oral argument, the Court discussed the possibility of allowing the parties to engage in limited discovery to address factual questions related to the circumstances under which Castillo signed the Franchise Agreement. Upon further reflection, the Court concludes that such discovery is not appropriate. Both parties introduced evidence on this question in support of their briefs. Although the question of whether the parties entered into an agreement to arbitrate was squarely raised in Plaintiff's Opposition brief, Defendants chose not to introduce any testimony from Vega in support of their Reply brief, even though they introduced *other* evidence on this question. Further, although Castillo stated in his declarations that he did not receive the Franchise Disclosure Documents in advance of the meeting in September when he signed them, and Defendants clearly understood the importance of this factual question (having introduced their own evidence purportedly showing that Castillo received these documents in June), Defendants' counsel could only speculate at oral argument about what Vega's testimony might be if she were deposed because they had not contacted her to discuss her interactions with Castillo or to ask her if she had any specific memory as to when she provided the Financial Disclosure Documents to him. (Nor

1. Castillo's ability to speak and understand English is extremely limited. He conducted all of his conversations with D&G employees – both before and after entering into the Franchise Agreement – almost entirely in Spanish. In signing the Franchise Agreement he relied on the translation of that agreement provided by D&G employee Vilma Vega. Vega had previously assisted him in completing his franchise application, which was in English, and told Castillo he could respond in Spanish. She also helped him to complete the English language multiple choice test he was required to take after he entered into the Franchise Agreement. For the most part, Castillo did not communicate directly with clients and on the occasions when he met with clients, he was accompanied by a bilingual D&G employee who did most of the talking and translated for Castillo when needed. Given his very limited understanding of English, Castillo could not have understood the terms of the arbitration agreement in the Franchise Agreement and other Franchise Disclosure Documents, or that he was waiving any rights, without assistance. Although he asked for a Spanish-language version of the Franchise Disclosure Documents, he was told that none existed.

2. Castillo did not receive the Franchise Disclosure Documents in advance of September 26, 2011 meeting with Vega, when he signed them. The Receipt and Acknowledgment of Receipt upon which Defendants rely to show that Castillo received these documents before the September 26, 2011 meeting were signed by Castillo but the June 14, 2011 date reflected on those documents was not in his handwriting and he did not write those dates, which are not accurate.[9]

_____

did Defendants represent to the Court that they had any reason to believe that Vega's testimony would contradict Castillo's sworn statement that Vega translated sections of the Franchise Agreement for him but did not tell him about the dispute resolution provisions.) As Defendants were unable to make a good-faith proffer at the motion hearing as to what testimony Vega might offer, or even that it would contradict Castillo's testimony, the Court declines to permit further discovery and concludes that the record is sufficient developed to make factual findings relevant to the Motion.

[9]The Court notes that at oral argument, Defendants conceded that although these documents were attached to the Crum Reply Declaration, Crum had no personal knowledge with regard to who filled in the dates on the forms, or when they were actually completed. Rather, Defendants relied on these documents (including the dates stated in them) on the basis that they were "business records." The business record exception against hearsay under Rule 803(6) of the Federal Rules of Evidence applies only if the custodian of the records, or some other "qualified witness" offers a declaration attesting that "the record was made at or near the time by--or from information transmitted by--someone with knowledge; . . . the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

3.  Vega encouraged Castillo to come to the September 26, 2011 meeting with a check to cover the down-payment for the franchise, which he did.  She also encouraged him to sign the documents at that meeting and did not advise him to take them home to review them or to obtain assistance in understanding them or the advice of an attorney.

3. Castillo's financial means are limited; he earns approximately $35,000 to $40,000 a year and this income is devoted almost entirely to supporting his wife and four children. J & V Maintenance is simply a d/b/a that Castillo was required by a former employer to adopt to receive payment for his work. It does not have any employees other than Castillo, who, at the time he purchased his franchise, had worked as a janitor for ten years and earned approximately $35,000 a year.  At the time he signed the Franchise Agreement, Castillo was under financial pressure because he had been laid off more than six months before and desperately needed work to support his family.

### C.  Whether the Franchise Agreement is Void Due to Fraud in the Inception

Castillo contends that the Motion should be denied because there was fraud in the inception and therefore, under California law, the arbitration agreement is void.  Defendants do not dispute that California contract law applies to the question of whether there is a valid agreement to arbitrate. *See Wolsey, Ltd. v. Foodmaker, Inc*., 144 F.3d 1205, 1210 (9th Cir. 1998) (holding that courts apply state contract law in determining the validity and scope of an arbitration agreement).  They argue, however, that Plaintiff has not demonstrated that the arbitration agreement is void under the doctrine of fraud in the inception.  The Court disagrees.

California law provides that if there is fraud in the inception of an agreement such that "the promisor is deceived as to the nature of his act," then "mutual assent is lacking" and the contract is void. *Rosenthal v. Great W. Fin. Sec. Corp*., 14 Cal. 4th 394, 415 (1996).  This theory can apply to void arbitration clauses. *Id*. at 415-16. To succeed on this theory, Plaintiff must show:

---

[and] making the record was a regular practice of that activity." Fed.R. Evid. 803(6)(A)-(C). The Crum Reply Declaration does not satisfy these requirements, which are not addressed at all. Furthermore, the business records exception does not apply if the opponent "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness," as is the case here.

(1) misrepresentation (including by omission) and (2) reasonable reliance on that misrepresentation. *Id*. at 419–20; *Ramos v. Westlake Servs. LLC*, 242 Cal. App. 4th 674, 688–89 (2015); *Vasquez v. Libre by Nexus, Inc.*, No. 17-cv-00755 CW, Docket No. 76 (Order on Motion to Compel, Motion to Dismiss, and Motion for Sanctions) (hereinafter, "Vasquez Order") at 7. Here, Vega purported to describe the contents of the Franchise Agreement at the time Castillo signed it and did not disclose that the Franchise Agreement (or the Franchise Disclosure Documents generally) included an agreement to arbitrate disputes between the parties. Therefore, the first requirement is met. The question that remains for the Court to decide is if Castillo reasonably relied on Vega's description of the contents of the Franchise Agreement. The Court finds that he did.

In addressing the question of reasonable reliance, the Court looks for guidance to the handful of cases that have addressed this question under similar circumstances, starting with the California Supreme Court's decision in *Rosenthal*. In that case, the court explained that "[w]here . . . a party's apparent assent to a written contracted is *negated* by fraud in the inception, there is simply no arbitration agreement to be enforced." 14 Cal. 4th at 416 (emphasis in original).[10] Thus, an arbitration agreement may be "wholly void, despite the parties' apparent assent to it, when '*without negligence on his part*, a signer attaches his signature to a paper assuming it to be a paper of a different character.'" *Id*. at 420 (quoting *CIT Corp. v. Panac*, 25 Cal. 2d 547, 549 (1944)) (emphasis added in *Rosenthal*) (internal citations and quotations omitted). The Court in *Rosenthal* found that that rule would apply to investors who signed client agreements containing an arbitration clause where they had very limited understanding of English and relied on a description of the contents of the agreement by two representative of the investment company ("GWB") who they believed (erroneously) to be employed by a bank where they maintained deposits ("GWFSC"). *Id.* at 427-428. Although the California Supreme Court remanded for further factual findings because it found the evidence to be ambiguous, it made clear that "[i]n light of the

---

[10] In *Rosenthal*, and in California case law generally, "fraud in the inception" and "fraud in the execution" are used interchangeably. *See* 14 Cal. 4th at 415. For simplicity, the undersigned uses "fraud in the inception" herein but considers the two phrases to refer to the same concept.

plaintiff's past relationship with GWB, which they were led to believe was also the employer of [the representatives], their limited ability to understand English, and [the representatives'] representations that their oral recitals accurately reflected the terms of the agreement, plaintiffs would not have been negligent in relying on the GWFSC representatives instead of reading the agreement themselves." *Id*. at 428.

On the other hand, the *Rosenthal* court found that there was *not* fraud in the inception as to other investors who had no difficulty speaking or understanding English and claimed that they signed the client agreement that contained the arbitration clause without reading it based on assurances by representatives of GWB (who they also believed were employed by their bank, GWFSC) that they didn't need to read the contract. *Id*. at 424. In that situation, the court explained, the facts were not "so compelling as to make reasonable plaintiffs' complete reliance on the representatives." *Id*. Instead, under these circumstances the clients' long-term relationship with GWB only explained "to some degree" their reliance on the assurances of the representatives and did not "establish these plaintiffs lacked a reasonable opportunity to learn the character of the documents they signed." *Id*. at 425.

In *Ramos v. Westlake Services LLC*, the California Court of Appeal relied on *Rosenthal* to find that an arbitration clause was void due to fraud in the inception. There, the plaintiff, Alfredo Ramos, whose primary language is Spanish, purchased a used car at a car dealership, signing a contract, entitled "Conditional Sale Contract and Security Agreement" ("Sale Contract") that was in English. 242 Cal. App. 4th at 677-679. The Sale Contract contained an arbitration provision. *Id*. at 679. Ramos was greeted at the dealership by an employee who spoke Spanish with him, and the transaction was primarily conducted in Spanish. *Id*. at 686-687. The contract Ramos signed was in English but he was also provided with a Spanish language version of the Sale Contract (the "Ramos Translation"); that version, however, did not contain the arbitration provision. *Id*. at 680. Under these circumstances, the court refused to enforce the arbitration provision, finding fraud in the inception because Ramos's reliance on the Spanish translation of the Sale Contract was reasonable. *Id*. at 690. The court explained:

> The Ramos Translation was not just inaccurate. Rather, it *completely*

18

omitted the arbitration agreement that [Defendant] now seeks to enforce. By providing Ramos a translation that did not even reference arbitration, let alone translate the terms of the arbitration agreement, [Defendant] "deprived [Ramos] of a reasonable opportunity to learn the character and essential terms of the [arbitration agreement] he signed.

242 Cal. App. 4th at 690 (quoting *Rosenthal*, 14 Cal. 4th at 428).

Finally, in *Vasquez*, Judge Wilken reached a similar conclusion based on *Rosenthal* and *Ramos*, finding fraud in the inception with respect to an arbitration provision signed by individuals who only speak and read Spanish. In *Vasquez*, the plaintiffs were individuals from Honduras who had come to the United States to seek asylum and had been detained by United States Immigration and Customs Enforcement ("ICE"). Vasquez Order at 1. The defendant, Libre by Nexus ("LBN"), is an organization that works with families to seek release of their family members from immigration detention. *Id*. The plaintiffs' spouses contacted LBN to arrange for their release and LBN, in turn, picked up each of the plaintiffs, gave them a cell phone to contact their families, and drove them to an LBN office. *Id*. at 2. There, the plaintiffs were presented with disclosures and agreements written in English and LBN discussed some portions of the agreements with the plaintiffs in Spanish. *Id*. at 3. LBN representatives did not, however, discuss the arbitration provision in the agreements. *Id*. Further, although LBN gave the plaintiffs a document in Spanish containing "five key points" it also did not mention the arbitration provision. *Id*. at 4. The court found fraud in the inception for the following reasons:

> Here, Plaintiffs have sufficiently shown that LBN fraudulently concealed the arbitration clause. The parties agree that LBN did not provide Plaintiffs with a written Spanish version of the arbitration clause. The "key facts" sheet does not mention the arbitration clause. . . . Instead, LBN contends that it translated the entire contract (including the arbitration clause) into Spanish orally. But Plaintiffs each testified that LBN representatives did not translate or explain the arbitration clause. . . . And LBN's own evidence shows that it is unlikely that LBN translated the arbitration clause into Spanish for Plaintiffs . . . Plaintiffs only speak and read Spanish and are not proficient in English. . . LBN representatives purported to translate the English-language contract into Spanish orally. Thus, Plaintiffs reasonably relied on LBN's oral representations and "key facts" sheet as accurate translations of the English-language agreements.

*Id*. at 8-9.

The cases above instruct that the threshold for demonstrating fraud in the inception is high.

The fact that an individual who signs an arbitration agreement is not proficient in English is not, by itself, enough to demonstrate fraud in the inception, even if the agreement was provided only in English. As the court in *Ramos* noted, "[n]o law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract." 242 Cal. 4th at 686 (internal quotation and citation omitted). Thus, California courts have held that "one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it." *Id.* (internal quotations and citations omitted). This rule applies even to someone who can't read, who is expected to "have it read or explained to him." *Id.* (internal quotations and citations omitted). Similarly, in *Rodriguez v. Sim*, Judge Larson found that there was no fraud in the inception where the plaintiff's primary language was Spanish but she had had the contract (which was in English) at home and therefore had an opportunity to discover the arbitration provision. No. C 08-3982 JL, 2009 WL 975457, at *6 (N.D. Cal. Apr. 10, 2009). In particular, he reasoned that "[h]aving the written Arbitration Agreement at home, with her English-speaking son, Mario Nunez, who actually assisted her in filling out the certification of the Arbitration Agreement, Plaintiff had a reasonable opportunity to discover its terms." *Id.*

In *Rosenthal*, *Ramos* and *Vasquez*, however, there were additional facts that rendered the agreements these plaintiffs signed void, namely, representations on which these plaintiffs relied and circumstances that made it reasonable for them to rely on these representations. In each case, somewhat different facts supported the courts' conclusion that the plaintiff's reliance was reasonable but the Court finds that there is significant overlap between the facts in those cases and the facts here. Like the plaintiffs in *Rosenthal*, *Ramos* and *Vasquez*, Castillo is not proficient in English and could not have understood the arbitration agreement (or the Franchise Disclosure Documents as a whole) without assistance. Having asked for a Spanish language translation of the agreement and been told there was none, he relied on Vega's assurance that she would assist him and he relied on her translation of the documents. Castillo Supp. Decl., ¶ 6 ("She said the documents were not in Spanish, but that she would be able to provide me with oral translations. I relied on her oral translation, as I could not read the Franchise Agreement and other documents

20

myself.").  In fact, she had assisted him before, when he completed the application at his first meeting with her.  *See id.* ¶ 4 ("During our first meeting, Vilma asked me to fill out an application form. Since the form was in English, she helped me complete it by translating for me. Some of the sections, like name and address, I completed without her assistance, as I was familiar with those words. Some of the portions I completed in Spanish on her direction.").  Based on this past assistance and his numerous conversations with Vega prior to signing the Franchise Agreement Castillo, like the plaintiffs in *Rosenthal*, believed he could trust Vega's translation. It is undisputed that Vega did not tell Castillo about the existence of the arbitration provision in the Franchise Agreement, much less explain what it meant.  Nor is there any evidence in the record that she told Castillo about the Addendum that shifts the costs of arbitration to the losing party.

In addition, unlike the plaintiffs in *Sim*, Castillo did *not* have an opportunity to review the Franchise Agreement or other Franchise Disclosure Documents at home before signing the Franchise Agreement.  Instead, he was presented with these documents for the first time at the meeting that he and Vega had set up to finalize the agreement and make a down-payment, on September 26, 2011.  Vega did not encourage Castillo to consult an attorney or obtain English language assistance so that he could fully understand the terms of the documents he was signing; instead, she encouraged him to rely on her translation of the documents.  Under these circumstances, the Court concludes that Castillo has demonstrated that he reasonably relied on Vega's translation and was unaware that he was entering into an arbitration agreement, giving rise to fraud in the inception and rendering the arbitration agreement void.

### D.  Whether the Arbitration Agreement is Enforceable under *Armendariz*

Castillo argues that even if the Court does not find fraud in the inception, it should not enforce the arbitration agreement because it contains numerous provisions that are unconscionable or violate public policy under *Armendariz* and the agreement cannot be fixed by severing them. The Court concludes that Plaintiff is correct.[11]

---

[11] As discussed below, the Court concludes that the *Armendariz* requirements that apply to agreements to arbitrate claims asserted under state statutes are largely mirrored by requirements under federal common law that apply to agreements to arbitrate claims asserted under federal statutes.  While the Court may refer as a short-hand to the *Armendariz* factors, to the extent it

### 1. Overview of *Armendariz*

In *Armendariz*, the California Supreme Court addressed whether employees who had signed an arbitration agreement as a condition of their employment could be compelled to arbitrate wrongful termination claims asserted under California's Fair Employment and Housing Act ("FEHA") and related contract and tort claims. 24 Cal. 4th 83, 92 (2000). The court began its analysis by addressing whether FEHA prohibited arbitration outright. *Id*. at 98-99. It concluded that it does not, finding that there was "nothing in the language or the legislative history of the FEHA that suggests it was intended to prohibit arbitration." *Id*. at 98. Nonetheless, it found that the rights protected under FEHA are unwaivable because the law was enacted for a public purpose and therefore, that arbitration agreements that encompass such rights must be "subject to particular scrutiny." *Id*. at 100. The court explained that the "unwaivability" of the rights protected under FEHA derives from "two statutes that are themselves derived from public policy." *Id*. First, California Civil Code section 1668 states that contracts that "have for their object . . . to exempt anyone from responsibility for his own . . . violation of law . . . are against the policy of the law." *Id*. (quoting Cal. Civ. Code § 1668). Second, California Civil Code section 3513 provides that "[a]nyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened for a private reason." *Id*. (quoting Cal. Civ. Code § 3513). The *Armendariz* court concluded that an arbitration agreement may be enforced with respect to unwaivable statutory rights if it "'(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum.'" *Id*. at 102 (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1481-1482 (D.C. Cir. 1997)). An arbitration agreement that does not meet these requirements (hereinafter, "the *Armendariz* requirements") is unenforceable with respect to unwaivable statutory claims because, under *Armendariz*, it results in the waiver of substantive rights protected by the statute and

---

addresses the enforcement of the arbitration agreements as to claims under federal statutes, the Court also relies on the standards of federal common law.

therefore is against public policy.

The court in *Armendariz* went on to apply these principles to the arbitration agreement in that case, which incorporated all of the rules of the California Arbitration Act ("CAA").[12]  First, the court concluded that the arbitration provision was against public policy to the extent that it explicitly provided that an award of backpay was the exclusive remedy available for violations of the terms, conditions, or covenants of employment.  *Id*. at 103-104.  The court found that this provision applied to all claims asserted by an employee, including statutory claims, thus prohibiting the employee plaintiffs from recovering punitive damages and attorneys' fees if they prevailed on their FEHA claims, even though FEHA provides for both.  *Id*. at 104. Therefore, the court found the limitation on remedies in the arbitration agreement to be unlawful.  *Id*.

With respect to whether the arbitration agreement permitted adequate discovery to protect the employees' substantive statutory rights, the court found that it did because it incorporated the rules set forth in the California Arbitration Act ("CAA"), which permit some discovery.  *Id*. (citing Cal. Civ. Code §1283.05).  The court further found that "when parties agree to arbitrate statutory claims, they . . . explicitly agree, absent express language to the contrary, to such procedures as are necessary to vindicate that claim."  *Id*. at 106.  The court reasoned that the employer had, "by agreeing to arbitrate the FEHA claims . . . already impliedly consented to such discovery" and therefore, that the arbitration agreement provided for "more than minimal discovery."  *Id*.  Similarly, the court found that the written award requirement was met because the CAA permits written findings and to the extent such written findings are required under FEHA, the arbitration agreement must be interpreted to provide for such findings.  *Id*. at 107.

Finally, the court in *Armendariz* addressed whether a provision of the CAA requiring parties to pay a pro rata share of arbitration costs, Cal. Civ. Code section 1284.2, rendered the arbitration agreement invalid.  The court held that "the imposition of substantial forum fees is contrary to public policy, and is therefore grounds for invalidating or revoking an arbitration agreement."  *Id*. at 110.  Conversely, the court held that "a mandatory employment arbitration

---

[12] The *Armendariz* court did not address the neutral arbitrator requirement because it was not at issue in the case.  *Id*. at 103.  That requirement also is not at issue in this case.

1   agreement that contains within its scope the arbitration of FEHA claims impliedly obliges the

2   employer to pay all types of costs that are unique to arbitration." *Id*. at 113. Nonetheless, the

3   court found that the parties' arbitration agreement did not conflict with that requirement because it

4   contained no "specific provisions on arbitration costs" and California Civil Code section 1284.2 is

5   a "default provision" that did not apply because of the parties' implicit agreement "to abide by the

6   substantive remedial provisions of the statute." *Id*. at 112.

7        The court in *Armendariz* went on to conduct a separate analysis addressing whether the

8   arbitration agreement was unenforceable based on the state law contract defense of

9   unconscionability, which applies not only to unwaivable statutory rights but to all claims. *Id*. at

10  113-121. The court explained that under California law, a contract is invalid "if it is both

11  procedurally and substantively unconscionable." *Id*. at 114-15. The court explained that

12  procedural unconscionability focuses "on 'oppression' or 'surprise' due to unequal bargaining

13  power," while substantive unconscionability focuses "on 'overly harsh' or 'one-sided' results."

14  *Id*. at 114 (internal citations omitted). While both must be present in order for a contract to be

15  declared unconscionable, courts apply a "sliding scale" where "the more substantively oppressive

16  the contract term, the less evidence of procedural unconscionability is required to come to the

17  conclusion that the term is unenforceable, and vice versa." *Id*. at 114. The *Armendariz* court

18  found that the procedural unconscionability requirement was met in that case because the

19  arbitration agreement was one of adhesion, that is, it was a mandatory condition of employment

20  where there was no opportunity to negotiate and the employer had superior bargaining power. *Id*.

21  at 114-115.

22       The court also found that the arbitration agreement was substantively unconscionable

23  because it was one-sided. *Id*. at 117-121. In particular, it required employees to arbitrate claims

24  for wrongful termination but did not require the employer to submit to arbitration other claims that

25  might arise out of the employee's termination. *Id*. The court reasoned that an arbitration

26  agreement contained in an adhesion contract must have a "modicum of bilaterality" to avoid

27  substantive unconscionability. *Id*. at 117. The court found the unfairness that resulted from the

28  one-sidedness of the arbitration agreement was exacerbated by the limitation on remedies

discussed above, which was also substantively unconscionable. *Id*. at 121.

Finally, the *Armendariz* court addressed whether the provisions that were unconscionable or violated public policy in the arbitration agreement rendered the entire agreement unenforceable or rather, whether the arbitration agreement could be enforced so long as the unlawful provisions were severed. *Id*. at 121-127. The court concluded that the entire agreement was unenforceable because: 1) there was more than one provision that was unlawful; and 2) as to the lack of bilaterality, the court found that the problem could only be remedied by reforming the agreement to impose additional obligations on the employer, something the court did not have the power to do. *Id*. As a consequence, the court concluded it could not remedy the deficiencies in the arbitration agreement simply by severing the offending provisions. *Id*.

### 2. *Concepcion* and Preemption of State Law Defenses

Subsequent to *Armendariz*, the U.S. Supreme Court addressed the savings clause in Section 2 of the FAA in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). In that case, the Supreme Court rejected the holding of *Discover Bank v. Superior Court*, 36 Cal.4th 148 (2005), in which the California Supreme Court found that a class action waiver in an arbitration agreement that was part of an adhesion contract was unconscionable and therefore invalid. While recognizing that the savings clause of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,'" the Supreme Court in *Concepcion* held that "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue" are preempted by the FAA. *Id*. (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Thus, even generally applicable contract defenses may be preempted if they "stand as an obstacle to the accomplishment of the FAA's objectives." *Id*. at 343. Applying that rule, the Court concluded that the prohibition against a class action waiver in an arbitration agreement under the guise of unconscionability "interfere[d] with fundamental attributes of arbitration," namely, "to "facilitate streamlined proceedings," and therefore, that the *Discover Bank* rule was preempted by the FAA. *Id*. at 344.

In the wake of *Concepcion*, California courts, including the California Supreme Court,

have found that *Armendariz* is still good law, relying on the Supreme Court's affirmation of the principle that the savings clause of the FAA permits application of state law contract defenses such as unconscionability in the context of arbitration agreements. *See Ramos v. Superior Court of San Francisco Cty.*, 28 Cal. App. 5th 1042 (Cal. Ct. App. 2018), as modified (Nov. 28, 2018) ("Since *Concepcion* was decided, the California Supreme Court has reaffirmed the validity of *Armendariz* multiple times") (citing *McGill v. Citibank, N.A.* 2 Cal. 5th 945, 962–963 (2017); *Sanchez v. Valencia Holding Co., LLC*, 61 Cal.4th 899, 910 (2015); *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1169 (2013)). Thus, for example, in *Ramos v. Superior Court*, the California Court of Appeal recently held that provisions of an arbitration agreement contained in a partnership agreement were unlawful both because they did not meet the five *Armendariz* requirements and because they were unconscionable. Nonetheless, the undersigned is mindful in applying *Armendariz* to the issues presented in this case that under *Concepcion*, state law defenses must not interfere with the fundamental attributes of arbitration.

### 3. *Cole, Gilmer* and agreements to arbitrate claims asserted under federal statutes

While the *Armendariz* requirements discussed above apply to agreements to arbitrate claims asserted under state statutes, those requirements are drawn from federal common law, which establishes similar requirements for agreements to arbitrate *federal* statutory claims.[13] In particular, the California Supreme Court in *Armendariz* looked to *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1481-1482 (D.C. Cir. 1997) for guidance. In *Cole*, the Court of Appeals for the D.C. Circuit addressed whether a Title VII claim could be subject to arbitration, balancing Congress's intent in enacting the FAA and Title VII. 105 F.3d at 1482-1483; *see also Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 101 (D.D.C. 2013) ("the *Cole* decision was based on balancing the goals of two competing federal statutes: promoting arbitration under the

---

[13] At oral argument, counsel for Plaintiff conceded that the *Armendariz* requirements apply to claims asserted under state statutes but that the public policy analysis in that case does not necessarily apply where a claim is asserted under a federal statute. Because Castillo asserts his trafficking claims under both state and federal statutes, the Court looks beyond *Armendariz* to the standards articulated under federal common law on the question of when arbitration agreements are enforceable as to claims asserted under federal statutes.

FAA and preventing employment discrimination under Title VII."). The court looked to *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (U.S. 1991), for guidance.

In *Gilmer*, the plaintiff asserted a claim under the Age Discrimination in Employment Act against his employer, who sought to compel arbitration under an arbitration provision the plaintiff was required to sign as a condition of employment. 500 U.S. 20, 23-24 (1991). The Supreme Court explained that "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." 500 U.S. 20, 26 (U.S. 1991). It further "recognized that '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" *Id*. (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 628 (1985)). Consequently, the Court held, "'[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.'" *Id*. (quoting *Mitsubishi*, 473 U.S. at 637). The Court went on to find that that standard was met under the parties' arbitration agreement because it provided for: 1) a neutral arbitrator; 2) sufficient discovery to afford the plaintiff a "fair opportunity" to pursue his claims; 3) a written opinion by the arbitrator; and 4) the same authority to award equitable relief as could be awarded by a court. *Id*. at 30-32.

In *Cole*, the court concluded that under *Gilmer*'s "effective vindication" doctrine, an arbitration agreement is enforceable with respect to federal statutory claims so long as it: "(1) provides for neutral arbitrators, (2) provides for more than minimal discovery, (3) requires a written award, (4) provides for all of the types of relief that would otherwise be available in court, and (5) does not require employees to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum." 105 F.3d at 1482. The first four requirements are taken directly from *Gilmer*, but the fifth requirement was not addressed in *Gilmer* because in that case the arbitration agreement provided that the employer would pay all of the arbitrator's fees. *Cole*, 105 F.3d at 1483-84. The court in *Cole* concluded that the fifth requirement was consistent with *Gilmer* for the following reasons:

> [I]n *Gilme*r, the Supreme Court endorsed a system of arbitration in

27

> which employees are not required to pay for the arbitrator assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement. Indeed, we are unaware of any situation in American jurisprudence in which a beneficiary of a federal statute has been required to pay for the services of the judge assigned to hear her or his case. Under *Gilmer*, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.

*Id*. at 1484.  The court went on to conclude that while reasonable arbitration costs comparable to the filing fees and administrative costs that parties must assume in federal court are not problematic, the daily arbitrator fees that the employee may have been required to pay in that case (the court found the arbitration agreement was unclear on who would pay these costs) were "prohibitively expensive" and that "it [was] unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court." *Id*.  It therefore read the arbitration agreement as requiring the employer to pay all costs of arbitration and enforced the agreement based on that interpretation.  *Id*. at 1485.

Courts continue to apply the *Cole* requirements to determine whether an arbitration agreement effectively vindicates the substantive rights afforded by a federal statute.  *See, e.g., CarMax Auto Superstores California LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1099 (C.D. Cal. 2015) ("to be enforceable, an agreement to arbitrate claims based on statutory rights must meet minimum requirements first articulated in *Cole v. Burns International Sec. Services*, 105 F.3d 1465 (D.C.Cir.1997)"); *Arreguin v. Glob. Equity Lending, Inc*., No. C07-06026 MHP, 2008 WL 4104340, at *6 (N.D. Cal. Sept. 2, 2008) (listing *Cole* requirements and noting that both the Ninth Circuit and the California Supreme Court have cited to this portion of *Cole* with approval) (citing *Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003); *Armendariz*, 24 Cal.4th at 102).  However, in the wake of the Supreme Court's decision in *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000), some courts have concluded that the application of the fifth *Cole* requirement must be limited to the extent that *Cole* set forth a per se rule prohibiting arbitration agreements that "contemplate an employee paying arbitral expenses other than those analogous to federal court filing fees and administrative expenses." *Andresen v. IntePros Fed., Inc*., 240 F. Supp. 3d

28

143, 152 (D.D.C. 2017).

In *Green Tree*, the Supreme Court recognized that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." 531 U.S. 79, 90 (2000). Nonetheless, it found that the arbitration agreement in that case was enforceable, even though it was silent as to who would bear the costs and fees of arbitration and there was a risk that the plaintiff would be required to pay prohibitive costs. *Id*. at 90-91. The Court reasoned that "[t]he party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. . . Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id*. The undersigned agrees with the court in *Andresen* that while the *Cole* requirements remain good law, the fifth factor requires that the party opposing arbitration show that prohibitive costs are likely to be imposed upon that party, consistent with *Green Tree*.[14]

### 4. Whether the Arbitration Agreement Meets the Requirements of *Armendariz Gilmer* and *Cole*

As a preliminary matter, the Court finds that the CTVPA, under which Castillo asserts his state law trafficking claim, was enacted for a public purpose and therefore, that the rights afforded under that statute are unwaivable. *See* 2005 Cal. Legis. Serv. Ch. 240 (A.B. 22) (adding human trafficking to the list of matters to be prioritized by the Attorney General, alongside "organized

---

[14] It is not clear whether the Supreme Court's holding in *Green Tree* imposes the same burden on parties challenging cost provisions in arbitration agreements under *Armendariz*. The California Supreme Court has held that it does not. *See Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1085 (2003) ("we do not believe that the FAA requires state courts to adopt precisely the same means as federal courts to ensure that the vindication of public rights will not be stymied by burdensome arbitration costs. We continue to believe that *Armendariz* represents the soundest approach to the problem of arbitration costs in the context of mandatory employment arbitration. We therefore conclude that on remand the court compelling arbitration should require the employer to pay in this case 'all types of costs that are unique to arbitration.'") (quoting *Armendariz*, 24 Cal.4th at p. 113.). However, *Little* was decided before *Concepcion*, which raises the possibility that the approach to evaluating whether cost provisions in arbitration agreements are enforceable under *Armendariz* and *Little* may no longer be consistent with the Supreme Court's jurisprudence relating to FAA preemption. The Court need not decide this question, though, because it finds that Castillo has met the more stringent standard under *Green Tree*, as discussed below.

crime, gang activities, drug trafficking, and cases involving a high degree of risk to the witness"
under CTVPA).  The Court further finds that the *Armendariz* requirements are not limited to the
arbitration of FEHA claims but rather, apply to the arbitration of any claim asserted under a
California statute that affords unwaivable rights.  *See Mercuro v. Superior Court*, 96 Cal.App.4th
167, 180 (2002) (concluding that *Armendariz* factors apply to Labor Code violations and all
claims under any statute enacted for a public reason).  Accordingly, the *Armendariz* requirements
apply to the parties' agreement to arbitrate the CTVPA claim.  Likewise, the requirements of
federal common law, as set forth in *Gilmer* and *Cole* and limited by *Green Tree* and *Concepcion*,
apply to the arbitration of Castillo's federal trafficking claim. Below, the Court addresses these
requirements as they relate to the provisions of the arbitration agreement at issue here.

The 180-day requirement:  As discussed above, the Franchise Agreement requires that the
parties must engage in direct negotiations before pursuing mediation or arbitration and states that
"[i]f such negotiations fail to reach an agreement, the party dissatisfied with the outcome of
negotiations must submit the dispute, within 180 days, to mediation and/or arbitration under this
Section."  Crum Decl., Ex. A at ECF pp. 41. Although Defendants agree to waive this provision,
they contend it is not problematic because it does not limit the time allowed for initiating direct
negotiations in the first instance.  Reply at 10.  They further assert that because the Franchise
Agreement does not expressly state that claims are barred if the 180-day requirement is not met,
failure to satisfy that requirement will not result in any claim being barred.  *Id*.  The Court rejects
both arguments.

Courts have found that arbitration agreements that impose a shorter limitations period than
is permitted by statute may be unconscionable and deprive a plaintiff of the full range of statutory
remedies – and thus, their substantive rights under the statute – in violation of *Armendariz*  and
*Gilmer*.  *See Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002) (holding that
one year limitations period on arbitration of claims under arbitration agreement deprived the
plaintiff of the right to assert claims under FEHA's continuing violation doctrine and therefore
deprived the plaintiff of his full range of statutory remedies); *Al-Safin v. Circuit City Stores, Inc*.,
394 F.3d 1254, 1262 (9th Cir. 2005) (citing *Adams* and finding that arbitration agreement required

the plaintiff to "forgo essential substantive and procedural rights" based, in part, on reduced limitation period); *Graham Oil Co. v. Arco Products Co.*, 43 F.3d 1244, 1247-1248 (9th Cir. 1994) (finding that where arbitration provision in franchise agreement "reduce[d] the time in which a claim [could] be brought from one year to 90 days or in some cases six months" it "strip[ped] franchisees" of their statutorily mandated rights in violation of *Gilmer*); *Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011) (holding that arbitration agreement that required the plaintiff to bring claims within 180 days instead of the one year allowed under FEHA deprived the plaintiff of statutorily mandated rights under *Armendariz*).

Turning to the 180-day requirement here, the Court finds that the provision is ambiguous but that under any reasonable interpretation, it deprives Castillo of his substantive rights and remedies under the trafficking statutes at issue in this case. Because the language quoted above does not clearly state what the 180-day requirement relates to, it could be interpreted in a number of ways. One reasonable interpretation is that this language requires that claims be brought to arbitration within 180 days of the relevant conduct. (The Court disagrees with Defendants that this provision does not place limitations on the time allowed to initiate direct negotiations as the language is not clear on that point.) In contrast, the federal trafficking claim has a 10-year statute of limitations and the California trafficking law has a seven-year statute of limitations. 18 U.S.C. § 1595(c); Cal. Civ. Code § 52.5(c). Further, under the California trafficking statute, this limitation period is tolled if "a person entitled to sue is under a disability at the time the cause of action accrues so that it is impossible or impracticable for him or her to bring an action" and "if a person entitled to sue could not have reasonably discovered the cause of action due to circumstances resulting from the trafficking situation, such as psychological trauma, cultural and linguistic isolation, and the inability to access services." Cal. Civ. Code § 52(5)(d), (e). Consequently, a 180-day limitations period dramatically reduces the time allowed to bring the trafficking claims asserted here. Further, this 180-day limitation is particularly onerous in light of the requirement under the arbitration agreement that parties must engage in both direct negotiations and mediation *before* initiating arbitration.

Other reasonable interpretations of the 180-day requirement are that it requires arbitration

to be initiated within 180 days of the date when the parties began direct negotiations or alternatively, within 180 days of the date when direct negotiations broke down. Under these interpretations, the arbitration agreement does not reduce the time to begin direct negotiations but nonetheless imposes a significant procedural burden on parties seeking to arbitrate claims, especially as the arbitration agreement contains no provision tolling the 180-day period while a party pursues the required direct negotiations and mediation that are prerequisites to initiating arbitration. (Nor does the arbitration provision provide for tolling of the 180-day period on *any* of the grounds that give rise to tolling under the California trafficking law.) The Court need not decide which interpretation of this provision is correct because it is apparent that under any of them, the 180-day requirement deprives Castillo of his statutorily mandated rights by shortening the limitation period or imposing a significant procedural barrier that may deprive him of his ability to assert his claims.[15] *See Estrada v. CleanNet USA, Inc*., No. 14-1785 JSW, Docket No. 77 at 5-6 (finding same provision to be ambiguous and severing from agreement). Consequently, the Court concludes that this provision does not satisfy *Armendariz*, *Cole* or *Gilmer*.

 <u>Minimal Discovery</u>: Castillo argues that the arbitration agreement does not protect his substantive rights because it allows for only minimal discovery, pointing to the requirement that arbitration must be conducted under the AAA's Commercial Arbitration Rules and the section prohibiting the parties from using the AAA's Employment Arbitration Rules. *See* Franchise Agreement Section XXII(B) & (C)(1). He further asserts that the AAA Commercial Arbitration Rules regarding "exchange of information between parties" are "extremely limited, relate only to document exchange, and contain no provision for interrogatories or depositions." *Id*. (citing Olivier Decl., Ex. A (AAA Commercial Rules), ECF pp. 20-21 (Rule R-22, "Pre-Hearing Exchange and Production of Information")). In contrast, the AAA Employment Arbitration Rules

---

[15] The Court rejects Defendants' suggestion that failure to adhere to the 180-day requirement – whatever it means – does not result in any claim being barred. Defendants cite no authority for this bizarre reading of the provision, which would render this language entirely superfluous. *See Tri-Union Seafoods, LLC v. Starr Surplus Lines Ins. Co*., 88 F. Supp. 3d 1156, 1164 (S.D. Cal. 2015) ("Under . . . California . . . law, courts must interpret contracts as a whole and in a manner that does not render any clause or provision superfluous.").

include a rule expressly devoted to "Discovery," which provides that the arbitrator "shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute."  Olivier Decl., Ex. B (AAA Employment Arbitration Rules), ECF p. 15.

The discovery permitted under the Commercial Arbitration Rules is, admittedly, more limited than what would be allowed under the Employment Arbitration Rules.  Nonetheless, the Commercial Arbitration Rules give the arbitrator the authority to "manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses."  Olivier Decl., Ex. A (Commercial Arbitration Rules) at ECF p. 20.  Further, the arbitrator may order depositions in "exceptional cases" for "good cause shown."  *Id.* at ECF p. 39.   In *Concepcion*, the Supreme Court specifically warned against the application of generally applicable defenses to limitations on discovery under arbitration agreements, which are likely to have "a disproportionate impact on arbitration agreements."  *See* 563 U.S. at 341-342.   With this guidance in mind, and in light of the fact that the AAA Commercial Arbitration Rules give arbitrators some authority to permit depositions – even if the burden for obtaining such discovery is high, the Court concludes that the minimal discovery requirement under *Armendariz* and *Cole* is satisfied.

Unreasonable Costs and Fees:  Castillo argues that the arbitration provision violates *Armendariz* because it unlawfully forces him to pay unreasonable costs and fees as a condition of going to arbitration, pointing to five separate requirements. First, the party initiating arbitration must pay the filing fee for the mediation, which is a mandatory prerequisite to arbitration; according to Castillo, that fee is $250.  Second, the Franchise Agreement provides that the parties must split the costs of mediation; according to Castillo, these costs can be several thousands of dollars.  Third, the party initiating arbitration must pay the filing fee, which is approximately $7,700.00.[16] Fourth, the parties must split the cost of arbitration, which often exceeds tens of

---

[16] At oral argument, Defendants stipulated that Plaintiff's estimate of the arbitration filing fee is accurate.

thousands of dollars, according to Castillo.  Finally, under the Addendum, the party initiating arbitration may be required to pay the *entire* cost of arbitration if he does not prevail.[17]

As discussed above, although an arbitration agreement that imposes unreasonable costs may be invalid under *Armendariz* and *Cole*, under *Green Tree* an arbitration agreement may be invalidated on that basis only where the plaintiff has demonstrated that there is a likelihood of incurring prohibitive costs under the challenged provisions. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000).  Thus, in *Estrada v. CleanNet USA, Inc.,* Judge White found that the same arbitration agreement that is at issue in this case was not substantively unconscionable based in part on his conclusion that the plaintiff "fail[ed] to provide the Court sufficient information from which the Court could draw a valid conclusion regarding Plaintiff's ability to split costs."  No. 14-1785 JSW, Docket No. 77 at 6.[18]  Here, the record is different.

First, Castillo has introduced evidence reflecting his financial means are very limited.  *See* Findings of Fact, above.  In particular, Castillo has earned approximately $35,000 a year for the past ten years and continues to earn between $35,000 and $40,000 a year.  Castillo Decl. ¶¶ 4, 15.  This income is devoted almost entirely to supporting his wife and four children, and the $8,500 Castillo paid as a down-payment on the franchise was most of his life savings.  *Id.* ¶¶ 14-15.  While Defendants imply that the mere fact that Castillo was able to make the down-payment

---

[17] Although Plaintiff challenged the cost-shifting provision in his Opposition brief, and identified it as "one of the key unconscionable provisions," *see* Opposition at 5, 13, 20, Defendants did not address that provision at all in their Reply brief.  At oral argument, in response to the Court's query, Defendants suggested for the first time that this provision was not part of the arbitration agreement at all.  A close reading of the Franchise Agreement, however, supports the opposite conclusion.  In particular, Section XXV states that "[t]his Agreement, *the documents referred to herein* and the Attachments hereto, if any, constitute the entire full and complete Agreement between the parties . . . ."  Franchise Agreement, Section XXV (emphasis added).  Further, the Franchise Disclosure Documents are expressly referenced in Section XXI(C), which states that the "Franchisee represents that it has read this Agreement and Franchisor's disclosure documents in their entirety and that it has been given the opportunity to clarify any provisions that it did not understand and to consult with an attorney or other professional advisor.  Franchisee further represents that it understands the terms, conditions and obligations of this Agreement and agrees to be bound thereby."  Finally, the plain language of the Addendum (which is contained in the Franchise Disclosure Documents referenced in the Franchise Agreement), purports to modify the arbitration agreement to shift costs to the losing party.  Therefore, the Court concludes that the modification in the Addendum is, in fact, part of the arbitration agreement.
[18] The Court notes that in *Estrada*, Judge White addressed only the cost splitting provision of the Franchise Agreement.  Apparently the plaintiffs in that case did not challenge the cost-shifting provision in the Addendum.

shows that his financial resources cannot be as limited as he suggests, they do not offer any evidence to support this assertion (or explain why they think it is true). On the flip side, Plaintiff has offered evidence relating to the costs of arbitration that persuades the Court that at least as to the three provisions related to those costs (payment of the arbitration fee, splitting of arbitration costs and cost shifting to the losing party) Castillo has met his burden.[19]

The Court's conclusion is based on two uncontroverted facts. First, Defendants concede that the filing fee to initiate arbitration is approximate $7,700. This is almost the same amount as Castillo paid for his franchise down-payment, which was almost his entire life savings. It is not in any way speculative to find on the basis of this evidence that the imposition of the cost of the arbitration filing fee on the party who initiates arbitration imposes a prohibitively high cost on Castillo and therefore will deprive him of his substantive rights as to both his state and federal claim. Second, the arbitration costs in the *Estrada* case, which involved the same defendants and the same arbitration agreement, were set by the arbitrator at almost $60,000 (which included over $38,000 in arbitrator fees). *See* Request for Judicial Notice, Ex. B (December 19, 2017 arbitration award in *Estrada*).[20] Although the claims asserted in that case were based on allegations that the plaintiffs were employees rather than independent contractors, the factual context of this case has significant overlap with the *Estrada* case, and the two cases appear to be comparable in terms of complexity. Consequently, the Court finds that the arbitration award in that case sheds significant light on the costs that would likely be incurred in this case if it were subject to arbitration.[21]

---

[19] With respect to the mediation filing fee of $250, the Court is not persuaded that this fee is prohibitive in light of Castillo's ability to pay, or that it is so unreasonable as to render this requirement suspect given that it is somewhat less than the filing fee for initiating an action in federal court. As to the cost of mediation, the Court concludes that Plaintiff's general statement that these costs "can be several thousands of dollars," *see* Opposition at 13, is not sufficiently specific or definite to satisfy Castillo's burden under *Green Tree* or to show that these costs are unreasonable under *Armendariz*.

[20] Defendants' request for judicial notice of this document, which is unopposed, is granted.

[21] The Court acknowledges that Defendants have agreed to waive all of the cost provisions and indeed, any provision the Court finds does not pass muster. The relevant inquiry, however, is whether the contract the parties *actually* agreed to contains invalid provisions, not whether Defendants are now prepared to offer a different contract. In *Ramos v. Superior Court*, the court rejected a similar argument, finding that the defendant's "willingness to have the court sever the invalid clauses [was] insufficient to save the agreement." 28 Cal. App. 5th 1042, 1069 (2018). The court pointed to the following observation of the California Supreme Court in *Armendariz*: "whether an employer is willing, now that the employment relationship has ended, to allow the

Further, to the extent that Castillo has shown that arbitration costs are likely to be in the range of $60,000, the Court concludes that both the provision that splits arbitration costs between the parties (which would require Castillo to pay $30,00 – or almost an entire year of his income) and the provision that imposes full costs on the losing party (which would require Castillo to pay $60,000) are sufficient to demonstrate that these costs are likely to be prohibitive and deprive Castillo of his substantive statutory rights. Therefore, the Court concludes that these three provisions violate *Armendariz*, *Cole* and *Gilmer*.

Finally, the Court rejects Defendants' argument that the cost provisions of the arbitration agreement are lawful because the AAA rules give the arbitrator the discretion to apportion fees and expenses as "appropriate." *See* Reply at 13 (citing AAA Commercial Rules, Rule 47). First, to the extent that the cost of initiating arbitration, by itself, is prohibitively high for Castillo, the possibility that an arbitrator might later award him costs does not address that problem. Similarly, with respect the cost splitting and cost shifting provisions, an award at the end of the arbitration does not sufficiently mitigate the deterrent effect of these provisions. As the court in *Armendariz* explained, "it is not only the costs imposed on the claimant but the *risk* that the claimant may have to bear substantial costs that deters the exercise of the constitutional right of due process." 24 Cal. 4th at 110. Therefore, "the cost issue should be resolved . . . when a court is petitioned to compel arbitration." *Id.*; *see also Pokorny v. Quixtar*, Inc., 601 F.3d 987, 1004 (9th Cir. 2010) (finding that "loser pays" provision in arbitration agreement was substantively unconscionable based on risk of incurring high arbitration costs).

<u>Limitation on Remedies</u>: Next, the Court must determine whether the waiver as to

---

arbitration to be mutually applicable, or to encompass the full range of remedies, does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy. Such willingness can be seen, at most, as an offer to modify the contract; an offer that was never accepted. No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." *Id.* (quoting *Armendariz*, 24 Cal.4th at 125); *see also Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 727 (N.D. Cal. 2012), aff'd, 549 F. App'x 692 (9th Cir. 2013) ("The offer to 'waive' the provision in this one lawsuit without reforming the objectionable provisions of the Agreement suggests that Defendants intend to maintain a systematic effort to impose unconscionable arbitration provisions."). Of course, this rule does not prevent the Court from severing problematic provisions under appropriate circumstances and enforcing the remainder of the agreement, as discussed above.

punitive damages in the Franchise Agreement, found in Section XXII(G) (quoted above and referred to hereinafter as "the punitive damages waiver"), violates *Armendariz* and *Gilmer*. As a preliminary matter, the Court notes that while the California trafficking law expressly provides for the award of punitive damages, *see* Cal. Civ. Code section 52.5(a), the federal trafficking law is less clear, providing only that a victim of human trafficking may recover "damages and reasonable attorneys fees." 18 U.S.C. § 1595(a). The Ninth Circuit has held, however, that because a trafficking claim sounds in tort, punitive damages are available under the civil damage provision of the TVPA. *Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011). Further, to the extent that the Franchise Agreement provides for the waiver of punitive damages on Castillo's state and federal trafficking claims, there is no question that it violates *Armendariz* and *Gilmer* as such damages are one of the remedies available to Castillo in court. *See Armendariz*, 24 Cal.4th at 103; *Ingle v. Circuit City Stores*, Inc., 328 F.3d 1165, 1178 (9th Cir. 2003); *Zaborowski v. MHN Gov't Servs., Inc.*, 936 F. Supp. 2d 1145, 1155 (N.D. Cal. 2013), aff'd, 601 F. App'x 461 (9th Cir. 2014).

The only remaining question is whether the words in the punitive damages waiver "to the fullest extent permitted by law" qualify the waiver such that it does *not* apply to Castillo's trafficking claims, as Defendants contend in their reply brief. *See* Reply at 14. Defendants argue that this interpretation finds further support in Section XXI(B)(4), which provides that "[t]he parties expressly agree that an arbitrator shall have the power to enter an award, including injunctive relief, protecting its rights to the same extent a court could do so, and such relief shall be enforceable by a court having jurisdiction under Section XXI.E. of this Agreement." *Id.* (quoting Franchise Agreement, Section XXI(E)(4)).

In determining the meaning of the punitive damages waiver in the Franchise Agreement, the Court looks to principles of contract construction under California law. "As a rule, the language of an instrument must govern its interpretation if the language is clear and explicit." *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*, 177 Cal. App. 3d 726, 730 (1986) (citing Cal. Civ. Code, § 1638; *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, 172 Cal.App.3d 914, 931 (1985)). While the "fundamental canon of interpreting written instruments is the ascertainment of the intent of the parties," *id.*, "ambiguities in written agreements are to be construed against their

37

drafters." *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 247 (2016) ("Where the drafter of a form contract has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract principles require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation."). In *Sandquist*, the California Supreme Court recognized that this rule applies with particular force where the contract is one of adhesion, that is, one where one party has disproportionate bargaining power relative to the other. *Id*. at 248.

"When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity." *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.*, 177 Cal. App. 3d at 730 (citing *Battram v. Emerald Bay Community Ass'n*, 157 Cal.App.3d 1184, 1189 (1984)). However, "[i]f a general and a specific provision are inconsistent, the specific provision controls." *Id*. (citing *National Ins. Underwriters v. Carter*, 17 Cal.3d 380, 384 (1976)).

Applying these principles to the provisions of the Franchise Agreement cited above, the Court looks first to the plain language of the agreement, which it finds to be ambiguous. Section XXII(G) requires the franchisee to waive its rights to punitive damages "to the fullest extent permitted by law." As Defendants have not pointed to any case in which a court has specifically held that the right to punitive damages under the state and federal trafficking laws may not be waived (or any statutory authority to that effect), it would not be unreasonable to interpret Section XXII(G) as a waiver of Castillo's rights to obtain punitive damages under these statutes. On the other hand, under *Armendariz* and *Gilmer*, it is fairly well-established that an arbitration agreement may not deprive a party of statutory remedies that would be available in a judicial proceeding. Based on that authority, another possible interpretation of the waiver provision is that it does *not* result in a waiver of punitive damages on Castillo's claims because such a waiver is not permitted by law. In determining which of these interpretations is correct, the Court must apply the rule that ambiguous terms are construed against the drafter. Under the circumstances here, the

38

Court concludes that rule means that the latter interpretation of the waiver provision is correct and therefore, that the arbitration agreement does not deprive Castillo of his statutory remedies.[22]

### 5. Whether the arbitration provision is unconscionable

Next, the Court addresses whether the arbitration provision is unconscionable, which "begins with an inquiry into whether the contract was a contract of adhesion—i.e., a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001) (citing *Armendariz*, 24 Cal. 4th at 113–114; *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817 (1981)). The Ninth Circuit has explained that "[u]nder current California law, it is unclear whether a contract of adhesion is inherently oppressive, and therefore automatically procedurally unconscionable, or whether oppression is a separate element that must be present. However, both standards for procedural unconscionability are satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to 'an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice.'" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006) (quoting *Flores*, 93 Cal.App.4th at 853). Those standards are undoubtedly met here.

As discussed above, evidence in the record establishes that Castillo's ability to understand English was very limited and his financial circumstances were also difficult. In addition to supporting his family on a yearly salary of approximately $35,000, he had been out of work for six months at the time he learned of the CleanNet franchise opportunity and he "desperately needed work to support [his] wife and four children." Castillo Decl.¶ 5. Further, he was not given a copy of the Franchise Agreement until the day he was expected to sign it and Defendants' representative falsified the date on documents later produced in this action to suggest that Castillo had a reasonable opportunity to discover the contents of the documents. There is no dispute that

---

[22] The Court is not, however, persuaded by Defendants' reliance on Section XXI(B)(4), which appears to give the arbitrator the power to award punitive damages. Because the arbitration agreement does not require the *franchisor* to waive its right to seek punitive damages, a provision giving the arbitrator the power to award such damages is not necessarily inconsistent with a waiver of punitive damages on the part of the franchisee.

Castillo was presented with the Franchise Agreement on a take-it-or-or leave it basis. And to make matters even worse, an important provision of the arbitration provision shifting costs to the losing party was not even contained in the Franchise Agreement but instead, was buried in the Addendum to the Franchise Disclosure Documents.[23] In other words, Castillo has made a strong showing of procedural unconscionability.[24]

### 6. Substantive Unconscionability

Castillo challenges the same provisions based on substantive unconscionability that he contends violate *Armendariz*. The Court's conclusions as to substantive unconscionability largely mirror its analysis under *Armendariz* and *Gilmer*. In particular, the Court concludes that the 180-day requirement and the three provisions relating to arbitration costs are substantively unconscionable. As discussed above, numerous courts have found that procedural barriers in arbitration agreements related to limitations periods are unconscionable and the Court concludes that the 180-day requirement in the arbitration agreement here is unconscionable as well. *See, e.g., Pokorny*, 601 F.3d at 999 (holding that shortened arbitration period in arbitration agreement was unconscionable); *Nyulassy v. Lockheed Martin Corp*., 120 Cal. App. 4th 1267, 1283 (2004) (holding that provision in arbitration agreement imposing 180-day limitation period was substantively unconscionable). Likewise, courts have regularly found that terms that require a litigant to pay high arbitration costs that the litigant cannot afford are harsh and one-sided. *See, e.g., Pokorny*, 601 F.3d at 1004 (holding that fee-shifting provision in arbitration agreement was unconscionable). Therefore, the Court concludes that at least these four requirements of the arbitration agreement are substantively unconscionable.[25]

---

[23] It is particularly telling that at oral argument, Defendants' counsel themselves were unable to find the Addendum without assistance from the Court, even though it was part of their own Financial Disclosure Documents, which consist of 166 pages, including the 41-page Franchise Agreement. The Addendum is found at ECF page 32 of the document, in the section described in the table of contents for the Financial Disclosure Documents as Exhibit D, "Franchisees – Bay Area." *See* Docket No. 70-2, at ECF pp. 8, 32. There is nothing in the table of contents to suggest that this exhibit contains any modifications or additional terms to the Franchise Agreement.

[24] The Court notes that Judge White found only minimal procedural unconscionability in *Estrada*, but that finding was based on a different factual record. Among other things, the plaintiffs in *Estrada* apparently did not rely on the loser pays provision in the Financial Disclosure Documents. Nor did the Court in that case find that there was fraud in the inception.

[25] With respect to the punitive damages waiver discussed above, the Court leaves open the

### 7. Severability

The final question the Court must decide is whether the sections of the arbitration agreement that are unenforceable can be severed such that the remainder of the agreement can be enforced. Under California law, courts have discretion to sever an unconscionable provision or refuse to enforce the contract in its entirety. *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002) (citing Cal. Civ. Code § 1670.5(a)). In determining whether illegal provisions of an arbitration agreement should be severed, courts should "look to the various purposes of the contract" to determine whether the "central purpose of the contract is tainted with illegality." *Armendariz*, 24 Cal. 4th at 124; *see also Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 896 (9th Cir. 2002) (finding that objectionable provisions could not be severed because they pervade[d] the entire contract"). Where an arbitration agreement strips a party of multiple important statutory rights and benefits, court have found that it is appropriate to invalidate the arbitration agreement as a whole rather than severing the illegal provisions. *See Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co*., 43 F.3d 1244, 1249 (9th Cir. 1994), as amended (Mar. 13, 1995) (invalidating arbitration clause as a whole because it contained three offensive provisions); *Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 803 (2012) (invalidating arbitration provision as a whole and noting that an employment arbitration agreement can be considered permeated by unconscionability if it contains more than one unlawful provision"); *Samaniego v. Empire Today LLC*, 205 Cal. App. 4th 1138, 1149 (2012) (same). Because the arbitration agreement contains at least four illegal provisions, the Court concludes that it is permeated by unconscionability and is unenforceable as a whole.

---

question of whether it also is substantively unconscionable. Although the Court found that the punitive damages waiver does not result in a waiver of punitive damages as to the claims Castillo asserts in this case, the provision appears to be one-side as it does not preclude a franchisor from seeking punitive damages against the franchisee whereas there are many claims that may be asserted by a franchisee where the waiver would apply. The parties have not briefed the question of whether a party challenging an arbitration agreement has standing to challenge a provision on the basis that it deprives one party (but not the other) of certain types of remedies where, as here, those remedies are available to the challenging party under the arbitration agreement on the specific claims it asserts. Nor has the court found any case law that addresses that question.

## IV. CONCLUSION

For the reasons stated above, the Motion is DENIED.

**IT IS SO ORDERED.**

Dated:  December 18, 2018

_____
JOSEPH C. SPERO
Chief Magistrate Judge